JESSICA BARRILLEAUX,

Plaintiff,

v.

MENDOCINO COUNTY,

Defendant.

Case No. 14-cv-01373-DMR

**ORDER DENYING IN PART AND GRANTING IN PART THE COUNTY'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 166, 197

Plaintiff Jessica Barrilleaux ("Barrilleaux") is an individual with a disability whose lawsuit arises out of an incident at the Mendocino County Superior Court courthouse located in Ukiah, California ("the courthouse"). She alleges violations of Title II of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the California Disabled Persons Act, *see* Cal. Civ. Code §§ 54, 54.1, and 55 ("CDPA"), California Government Code Section 11135, and state common law.

On April 23, 2013, Barrilleaux fell as she was walking down the stairs in the courthouse and injured her left knee. She filed this lawsuit against the Superior Court of California, County of Mendocino; the Judicial Council of California, Administrative Office of the Courts (collectively the "Judicial Defendants"); and Mendocino County ("the County"). Barrilleaux settled with the Judicial Defendants. All that remains are her claims against the County.

The County now moves for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. [Docket No. 166] ("MSJ"). Barrilleaux opposes and cross-moves for summary judgment. [Docket No. 197] ("Cross-MSJ"). The court ordered the parties to submit supplemental briefing, which the parties timely filed. [Docket Nos. 208, 209, 210]. The matter is suitable for determination without oral argument. Civ. L.R. 7-1(b). Having carefully considered the parties' submissions, the court grants in part and denies in part the County's motion and denies Barrilleaux's cross-motion.

# TABLE OF CONTENTS

I. EVIDENTIARY OBJECTIONS ............................................................................... 4

    A. Barrilleaux's Objections ........................................................................... 4

        1. Correll-Rose and Shaver Declarations ............................................. 4

        2. Supplemental Keck Declaration ....................................................... 6

        3. Amended Response to Barrilleaux's Rule 30(b)(6) Deposition Notice ......................... 7

    B. The County's Objections ........................................................................... 7

        1. Yu Declaration .................................................................................. 8

        2. Barrilleaux's Medical Records (Exhibits 1 through 4 to Yu Declaration) ................... 9

        3. Exhibits 4-11, 13, 14, 16, 23, and 24-26 to Rein Declaration ...................... 10

II. CLAIMS PROPERLY BEFORE THIS COURT ...................................................... 13

III. BACKGROUND ......................................................................................... 20

    A. History of the Courthouse ....................................................................... 20

        1. Prior Disability Access Complaints About the Courthouse ............ 21

        2. Transfer of Responsibilities Regarding the Courthouse ................ 22

        3. Barrilleaux's April 2013 Visits to the Courthouse ........................ 25

    B. Relevant Procedural History ................................................................... 26

IV. LEGAL STANDARD .................................................................................... 28

V. DISCUSSION ........................................................................................... 29

    A. The County's Motion for Summary Judgment ...................................... 29

        1. The ADA ............................................................................................ 30

            a. Existing Facilities - 28 C.F.R. § 35.150 ................................ 31

            b. New Construction and Alterations - 28 C.F.R. § 35.151 ...... 32

        2. The 1991 and 1996 Renovations, and Pre-2013 Construction Work on the 4th Floor. 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a. 1991 Renovation………..…………………………………………………33

b. 1996 Renovation………………………………………………………….35

c. Pre-2013 Construction Work on 4th Floor……………………………….35

3. Liability for Maintenance and Improvement of the Courthouse .................................. 36

4. Standing ......................................................................................................... 43

a. Causation…………………………………………………………………44

b. Redressability……………………………………………………….......45

c. Realistic Threat of Future Harm…………………………………………45

5. Mootness .................................................................................................... 48

6. ADA ............................................................................................................. 49

a. Denial of the County's Services, Programs, or Activities…………………...50

b. Discrimination Because of Disability………………………………… 52

c. Deliberate Indifference ………………………………………………...52

7. Section 504 ................................................................................................ 54

8. State Law Claims ...................................................................................... 55

B. Barrilleaux's Cross-Motion for Summary Judgment ....................................... 58

VI. CONCLUSION ............................................................................................... 59

## I. EVIDENTIARY OBJECTIONS

The parties each filed evidentiary objections.

### A. Barrilleaux's Objections

Barrilleaux objects to portions of the Declarations of Heather Correll-Rose and Christopher Shaver, the Supplemental Declaration of Anne Keck and certain exhibits attached thereto, and the County's Amended Response to Barrilleaux's Rule 30(b)(6) Deposition Notice.

#### 1. Correll-Rose and Shaver Declarations

Barrilleaux objects to the Correll-Rose and Shaver declarations because they base some of their statements on "information and belief," rather than personal knowledge as required by Federal Rule of Civil Procedure 56(c)(4).

Correll-Rose is a Risk Analyst with the County Executive Office. *See* Declaration of Heather Correll-Rose ("Correll-Rose Decl.") [Docket No. 168]. As a Risk Analyst, she analyzes and manages all tort claims and lawsuits filed against the County. Correll-Rose Decl., ¶ 1. The County designated her as its Rule 30(b)(6) witness on the existence of any complaints or requests for accommodation received by the County regarding disability access issues related to the main staircase and/or to the 4th floor of the courthouse from January 1, 1968 to December 1, 2016. *See* Def.'s Amended Resp. to Pl.'s Notice of Rule 30(b)(6) Dep. Notice ("Amended Resp. to Rule 30(b)(6) Depo. Notice") (Ex. I) at 4-5 to Suppl. Decl. of Anne Keck ("Suppl. Keck Decl.") [Docket No. 201-1]. In her declaration, Correll-Rose discusses various topics including the existence of prior disability-access complaints regarding the 2nd and 4th floors and the courthouse's restrooms, the County's prior knowledge of Barrilleaux's disability and her desire to access the courthouse, the area where Barrilleaux fell, and her access to other floors in the courthouse. Correll-Rose Decl., ¶¶ 2-4, 6, 8-12.

Shaver is the County's Deputy Chief Executive Officer. Decl. of Christopher Shaver ("Shaver Decl.") [Docket No. 167]. The County designated Shaver to testify as a Rule 30(b)(6) witness on the types of alterations made to the 4th floor of the courthouse containing courtrooms F and G from January 1, 1968 to December 1, 2016; all programs, services, and activities offered by the County on the 4th floor of the courthouse from July 1, 1994 to December, 1, 2016; and the

4

County's agreement with the Judicial Council Administrative Officer of the Court regarding the responsibility for maintenance, alteration, and construction of the courthouse from December 23, 2008 to December 1, 2016. *See* Def.'s Amended Resp. to Rule 30(b)(6) Depo. Notice (Ex. I) at 2, 7-9 to Suppl. Keck Decl. In his declaration, Shaver discusses the history of the courthouse and its layout, and the transfer of responsibility regarding the courthouse from the County to the Judicial Defendants. Like Correll-Rose, Shaver bases certain statements on "information and belief," in addition to personal knowledge. For example, he testifies on information and belief about the years in which certain portions of the courthouse were built, and whether any County office or department ever resided on the 4th floor. *See, e.g.,* Shaver Decl., ¶¶ 2-5, 16-17.

The objections are overruled. Correll-Rose and Shaver are the County's Rule 30(b)(6) deponents. They are providing testimony on behalf of the County. *See* Exs. 12 (Rule 30(b)(6) testimony of Shaver) [Docket No. 195-12] and 17 (Rule 30(b)(6) testimony of Correll-Rose) [Docket No. 195-17] to Rein Decl. As Rule 30(b)(6) declarants, they are not required to have personal knowledge of all the facts in their declarations. *See, e.g., Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1096 (N.D. Cal. 2015) (overruling hearsay, best evidence, and lack of foundation objections to Rule 30(b)(6) summary judgment declaration because "[a]s a Rule 30(b)(6) designee, the [30(b)(6) declarant] is not required to have personal knowledge"); *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1132 (N.D. Cal. 2009) (same). As some of the matters addressed in the declarations relate to historical events for which the parties offer no percipient witnesses, it is reasonable to expect the declarants to base certain statements on "information and belief," as well as their own review of historical records.

In support of her argument, Barrilleaux only cites to factually inapposite cases involving lay witnesses rather than Rule 30(b)(6) declarants. *See, e.g., Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831 (1950), *overruled in part by Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) (an attorney affidavit made on "information and belief" did not comply with Rule 56(e)'s[1] personal knowledge requirement); *Slade v. Baca*, 70 F. App'x 446, 448-49 (9th Cir. 2003)

---

[1] Rule 56(e) was the precursor to Rule 56(c)(4). *See* Fed. R. Civ. P. 54(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts

5

(the affidavit satisfied Rule 56(e)'s personal knowledge requirement because personal knowledge could be inferred from the fact that the declarant was a percipient witness); *Taylor v. List*, 880 F.2d 1040, 1045 n.3 (9th Cir. 1989) (the percipient witness affidavit was insufficient to create a triable dispute regarding the defendant's liability because it was made on "information and belief" and not personal knowledge as required by Rule 56(e)).

### 2.    Supplemental Keck Declaration

Barrilleaux objects to the Supplemental Keck Declaration, arguing that it contains inadmissible legal opinions about how to construe the County's response to Request for Admission ("RFA") No. 61, and is essentially four additional pages of legal argument that allows the County to exceed the 27-page reply brief page limit. *See* Suppl. Keck Decl. Although unclear, Barrilleaux also appears to move to strike Exhibit J to the Supplemental Keck Declaration, which contains the County's supplemental responses to RFA No. 61.

Keck represents the County in this action. *See* Suppl. Keck Decl., ¶ 1. Her supplemental declaration responds to a variety of Barrilleaux's assertions about the County's alleged failure to provide certain discovery and about the County's response to Request for Admission ("RFA") No. 61. *See* Suppl. Keck Decl., ¶¶ 4-9. Keck attaches the County's amended responses to RFA No. 61, which Barrilleaux did not provide, and then explains that despite its unqualified admission to RFA No. 61, its response should be construed as admitting only that certain work, namely cosmetic work, was performed on the 4th floor of the courthouse since January 1, 1969. *See id.,* ¶ 3; Ex. J to Suppl. Keck Decl. The objection to the portion of paragraph 3 where Keck attempts to explain how the County's response to RFA No. 61 should be interpreted is sustained as improper legal argument. The objections to paragraphs 4 through 7 are overruled. Keck has personal knowledge about her meet and confer efforts with Barrilleaux's counsel and the County's responses to Barrilleaux's discovery. She may testify about these topics in her declaration in which she responds to Barrilleaux's assertions about the County's alleged failure to produce

---

that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

relevant discovery.

Barrilleaux's motion to strike is denied as unnecessary. She is correct that the County was required to seek leave of court to withdraw or amend its original response to RFA No. 61 under Fed. R. Civ. P. 36(b). Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). However, her motion to strike makes no practical difference because the County's initial and amended responses are identical. *Compare* Amended Resp. to RFA Nos. 60 and 61 (Ex. J) to Suppl. Keck Decl. [Docket No. 201-2] with Resp. to RFA Nos. 60 and 61 (Ex. 3) to Rein Decl. [Docket No. 198-3]. RFA Nos. 60-61 ask the County to admit that "construction work was performed subsequent to January 1, 1969 and prior to April 23, 2013, on the subject property" and "on the 4th floor of the subject property." RFA Nos. 60-61 (Ex. 3). The County responded: "Admitted." Resps. to RFA Nos. 60-61 (Ex. 3). The County's amended responses are the same: "Admitted." Amended Resps. to RFA Nos. 60-61 (Ex. J).

### 3. Amended Response to Barrilleaux's Rule 30(b)(6) Deposition Notice

Although unclear, Barrilleaux also appears to move to strike the County's Amended Response to Barrilleaux's Rule 30(b)(6) deposition notice ("Amended Rule 30(b)(6) Response"), which is attached as Exhibit I to the Supplemental Keck Declaration. According to Barrilleaux, the court should refuse to consider the County's Amended Rule 30(b)(6) Response because it was served a day before the January 31, 2017 Rule 30(b)(6) deposition in a "manner [designed] to assure [that] Barrilleaux's attorney would be unable to see it, or prepare to respond." Pl.'s Reply at 4:18-20 [Docket No. 203].

The motion to strike is denied. Barrilleaux presents no evidence, and nothing in the record suggests that the County engaged in gamesmanship here. Additionally, Barrilleaux does not explain what prejudice, if any, she suffered.

### B. The County's Objections

The County moves to strike the Declaration of Jim W. Yu, Barrilleaux's medical records attached as Exhibits 1 through 4 to the Yu Declaration, and Exhibits 4-11, 13, 14, 16, 23, and 24-26 to the Declaration of Paul L. Rein on a number of grounds, including hearsay, lack of personal

7

knowledge, and lack of authentication.

### 1. Yu Declaration

The County moves to strike the Yu Declaration on the grounds that Yu lacks personal knowledge of the facts contained therein. *See* Decl. of Jim W. Yu ("Yu Decl.") [Docket No. 196]. Yu is one of Barrilleaux's attorneys. *See* Yu Decl., ¶ 1. In his eight-paragraph declaration, he testifies about Barrilleaux's disability, medical history, and prognosis, and the settlement with the Judicial Defendants. *Id.*, ¶¶ 2-8.

The objection to the following sentence in paragraph 1, "Plaintiff Jessica Barrilleaux was disabled under federal and California standards on April 16 and 23, 2013," is overruled. The County has agreed that Barrilleaux was "a qualified individual with disability at the time of the incident" for the purpose of this motion only. *See* Def.'s Mot. for Summ. J. at 13:28-14:2. The objection to the remainder of the paragraph 1 is sustained. Yu is not qualified to opine about the details of Barrilleaux's left knee surgery. Additionally, Yu's summary of her left knee surgery is inadmissible hearsay.

The objections to paragraph 3 are sustained. Yu's statements about Barrilleaux's mobility being "severely compromised" and Barrilleaux "appear[ing]" disabled to others lack foundation and are speculative. Yu has no personal knowledge of how she might have appeared to others since he was not present during her visits to the courthouse. Additionally, to the extent that Yu is summarizing Barrilleaux's deposition testimony, his testimony is inadmissible hearsay and improper legal argument. The objections to paragraphs 4 and 6 are sustained for the same reasons.

The objection to the statement regarding Barrilleaux's ongoing disability in paragraph 7 is overruled. It is undisputed that Barrilleaux is an individual with a disability for purposes of this motion. However, the objection to the remainder of the paragraph 7 is sustained. To the extent that Yu relies on information provided to him by Barrilleaux, his statement is inadmissible hearsay. *See* Fed. R. Evid. 801(c)(1), (2).

The objection to paragraph 8 is overruled. As Barrilleaux's attorney, Yu has personal knowledge of the total amount of the settlement with the Judicial Defendants, the portion of the settlement that Barrilleaux recovered after attorneys' fees and expenses, and what types of

damages her portion of the settlement covered.

## 2. Barrilleaux's Medical Records (Exhibits 1 through 4 to Yu Declaration)

The County moves to strike Exhibits 1 through 4, which are Barrilleaux's medical records, on the grounds that they are not authenticated and are hearsay. The objections are overruled. The fact that Barrilleaux did not submit a Custodian of Records declaration is not fatal to their admissibility. The documents may be authenticated under Rule 901(b)(4) because they are what they purport to be, namely medical records. *See* Fed. R. Evid. 901(b)(4) (documents may be authenticated based their "appearance, contents, substance, internal patterns, or other distinctive characteristics"). They are marked with Barrilleaux's name and date of birth, the name of the medical facility, the date of the procedure, and the name of the medical provider. Exs. 1 through 4 to Yu Decl.; *see also Tate v. Kaiser Found. Hosps.*, No. 2:12-cv-9075-CAS (RZx), 2014 WL 176625, at *1 n.1 (C.D. Cal. Jan. 15, 2014) (authenticating Kaiser medical records under Rule 901(b)(4) based on the characteristics of the medical records).

As to hearsay, at summary judgment, the focus is not on the "admissibility of the evidence's form," but rather on the "admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing cases)[2]; *see also Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to admissibility of police reports on authentication and hearsay grounds at summary judgment because the contents of the report "may be presented in an admissible form at trial") (citing to *Fraser*); *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility of exhibit at summary judgment because "it is possible that the facts underlying [the exhibit] could be admissible at trial") (following *Fraser*); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*,

---

[2] The County cites to *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) for the proposition that unauthenticated documents cannot be considered in a motion for summary judgment. While the County accurately quotes *Orr*, it appears that *Orr* is no longer an accurate summary of the law in this circuit in light of *Fraser* and the other courts in this district that have followed *Fraser*. *See, e.g., Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017); *Dillon v. Cont'l Cas. Co.*, 278 F. Supp. 3d 1132, 1137-39 (N.D. Cal. 2017); *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 397-98 (N.D. Cal. 2017). The County does not discuss *Fraser* in its papers.

828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.") (citing *Fraser*). The contents of Exhibits 1 through 4 may be admissible as statements made for medical diagnosis or treatment under Rule 803(4), provided that Barrilleaux lays the proper foundation at trial. Fed. R. Evid. 803(4)(A) - (B) (a statement made for medical diagnosis or treatment is one that is "(A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause").

### 3. Exhibits 4-11, 13, 14, 16, 23, and 24-26 to Rein Declaration

The County moves to strike Exhibits 4-11, 13, 14, 16, 23, and 24-26 to the Rein Declaration generally on hearsay grounds.[3]

The hearsay objections to Exhibits 4 and 11 are overruled. Exhibit 4 is a December 17, 1991 Minute Order from the Board of Supervisors, County of Mendocino, State of California ("December 1991 Minute Order"). Exhibit 11 is a December 29, 1991 Memorandum from Ray Hall, Planning and Building Services' Director and Al Bazzani, Building and Grounds Director to Mike Scannell, County Administrative Officer ("December 1991 Memorandum"). Exhibits 4 and 11 are public records under Rule 803(8). They are documents prepared by the County and/or its employees that detail the County's official activities, namely meetings of the Board of Supervisors and an evaluation of the need for County projects.

The County argues that the December 1991 Minute Order is not a public record because the document is not trustworthy. Specifically, the County's Rule 30(b)(6) deponent, Correll-Rose, testified that the December 1991 Minute Order was not "really a characterization of what happened" and that there were other reasons why the County declined to address handicap accessibility requirements when it remodeled the courthouse in 1991. *See* 30(b)(6) Depo. of Heather Correll-Rose ("30(b)(6) Rose Depo.") (Ex M.) at 75:11-77:3 to Suppl. Keck Decl.

---

[3] Although Barrilleaux does not address the admissibility of these exhibits in her papers, the court will assume that she seeks to admit these exhibits as public records under Rule 803(8), unless another hearsay exception is readily apparent.

[Docket No. 201-5]. However, this does not establish lack of trustworthiness of the record under Rule 803(8). At best, it goes to the weight of the evidence, which is reserved for the fact finder.

The hearsay objections to Exhibits 5, 6, and 7 are overruled. Exhibits 5 through 7 are invoices from Cupples Construction, the contractor hired by the County for the 1996 courtroom renovation. Because the County did not prepare these records and they do not set forth the County's official activities, Exhibits 5 through 7 are not admissible as public records under Rule 803(8). However, if Barrilleaux lays the proper foundation at trial, these invoices may be admissible under Rule 803(6) as business records because they appear to be contemporaneous records generated in the ordinary course of business.

The hearsay objections to Exhibits 8 and 9 are overruled. Exhibit 8 contains portions of the Transfer Agreement between the Judicial Council of California and the County of Mendocino for the Transfer of Responsibility for Court Facility. Exhibit 9 is the Joint Occupancy Agreement between the Judicial Council of California, Administrative Office of the Courts and the County of Mendocino. Exhibits 8 and 9 are public records under Rule 803(8) because they are documents prepared by either the Judicial Defendants and/or the County, and set forth their official activities, in this instance, the transfer of responsibility regarding the courthouse. Additionally, the County attaches the same documents as Exhibits D and E to the Shaver Declaration, so its objections are not well-taken.

The hearsay objection to Exhibit 10 is overruled. Exhibit 10, titled "Courtroom Construction Project Notes," is a collection of daily notes from October 15, 1996 to November 13, 1996 about the 1996 courtroom construction by an unknown author. Barrilleaux does not seek to admit these notes for the truth of the matters asserted therein. Rather, she offers them to show the occurrence of an event, specifically that the County constructed a courtroom in the courthouse in 1996.

The hearsay objection to Exhibit 13 is overruled. Exhibit 13 is a copy of Barrilleaux's Request to Calendar Case filed on April 16, 2013. Barrilleaux does not seek to admit it for the truth of the matters asserted. Rather, she offers it to show the occurrence of an event, namely, that on her April 16, 2013 visit to the courthouse, Barrilleaux filed a Request to Calendar to have her

traffic court matter heard on April 23, 2013 in courtroom G. The County includes the same document as an exhibit to its summary judgment papers, which is another reason why its objection is not well-taken. *See* Ex. A to Decl. of Anne Keck ("Keck Decl.") [Docket No. 169-1].

The hearsay objection to Exhibit 14 is sustained. Exhibit 14 is an unsigned and undated Standard Services Agreement between the County and Universal Protection Service for security guard services for the courthouse and the Fort Bragg Justice Center for the period of November 17, 2011 to November 16, 2013. Barrilleaux seeks to admit Exhibit 14 to show that the County hires security guards and hired the security guard she encountered on April 23, 2013 as an independent contractor. However, Exhibit 14 cannot be used to establish either fact. It is an undated and unsigned document, and on the current record, it is unclear whether it has any evidentiary value.

The hearsay objections to Exhibits 16 and 23 are overruled. Exhibit 16 is an Outline Specification for the Mendocino County Courthouse Courtroom dated October 10, 1996 prepared by Ross Drulis Architects. Exhibit 23 is a proposed bidding letter dated January 8, 1992 letter from Jonathan E. Byer, Architect/Building Contractor, to Al Bazzani, Manager of the Building and Grounds Department in the courthouse. Because the County did not prepare these records and they do not set forth the County's official activities, Exhibits 16 and 23 are not admissible as public records under Rule 803(8). However, provided that Barrilleaux lays the proper foundation at trial, Exhibits 16 and 23 may be admissible under Rule 803(6) as business records because they appear to be contemporaneous records generated in the ordinary course of business.

The hearsay objection to Exhibit 24 is overruled. Exhibit 24 is a November 19, 1991 letter from Frank R. Broadhead, an attorney with Redwood Coast Regional Center, to Dale Hawley, the County's Chief Enforcement Officer for Planning and Building Services. Exhibit 24 is admissible for the non-hearsay purpose of showing the County's knowledge of a prior disability access complaint and proposed accessibility solutions.

The hearsay objection to Exhibit 25 is overruled. Exhibit 25 is a December 9, 1991 Memorandum from Dale Hawley, Code Enforcement officer, to Al Bazzani, Building & Grounds, Subject: Courthouse Handicapped Access Complaint. It is a public record under Rule 803(8)

because it was prepared by the County and sets forth the County's official activities, in this case, responding to a disability-access complaint. Exhibit 25 is also admissible for the non-hearsay purpose of showing the County's knowledge of a prior disability access complaint.

The hearsay objection to Exhibit 26 is overruled. Exhibit 26 is an October 18, 2005 Executive Memorandum from Kristen McMenomey, Deputy Executive Officer to the Board of Supervisors Subject: ADA Self-Evaluation and Transition Plans. It is a public record under Rule 803(8) because it was prepared by the County and sets forth the County's official activities, in this case, the transition and self-evaluation plans created as a result of a settlement of a disability-access lawsuit. Exhibit 26 is also admissible for the non-hearsay purpose of showing the County's knowledge of a prior disability access complaint and of the need to make the courthouse accessible.

## II. CLAIMS PROPERLY BEFORE THIS COURT

Prior to addressing the parties' arguments, the court must first determine what claims properly are before the court at summary judgment. The County contends that the court should not consider the following five claims that Barrilleaux allegedly raises for the first time in her opposition and cross-motion for summary judgment: 1) injunctive relief to install stair lifts to the 4th floor; 2) injunctive relief and damages arising out of her contact with the security guard; 3) damages and injunctive relief arising out of her difficulty in using the 5th floor restroom; 4) injunctive relief to install a second set of disability accessible restrooms in the courthouse; and 5) an Unruh Act claim. The court considers each claim in turn.

The County argues that the law of the case doctrine precludes consideration of any claim for injunctive relief requiring installation of stair lifts to the 4th floor. According to the County, the court already denied this claim when it denied Barrilleaux's motion for preliminary injunction. *See* August 15, 2016 Order Denying Pl.'s Mot. for Prelim. Injunction [Docket No. 122]. This is incorrect. The court considered the issue regarding the stair lifts, but only in adjudicating whether Barrilleaux met the standard for issuance of a preliminary injunction. *See* August 15, 2016 Order Denying Pl.'s Mot. for Prelim. Injunction at 2; *see also Judkins v. HT Window Fashions Corp.*, 624 F. Supp. 2d 427, 440-41 (W.D. Pa. 2009) (explaining that the law of the case doctrine did not

preclude a party from filing a subsequent summary judgment on claims that were also at issue in a prior unsuccessful motion for preliminary injunction). Thus, the law of the case doctrine does not apply. *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (The law of the case doctrine only precludes a court "from reconsidering an issue previously decided by the same court, or a higher court in the identical case.") (citation and internal quotation marks omitted).

However, the court will not consider any claim for injunctive relief relating to the installation of stair lifts to the 4th floor because Barrilleaux did not identify it as one of the remaining claims against the County at the June 21, 2017 Case Management Conference. Following settlement with and dismissal of the Judicial Defendants, the case was reassigned to the undersigned upon the retirement of the Honorable Thelton E. Henderson. On June 21, 2017, the undersigned held a Case Management Conference. 6/21/17 Civil Conference Min. Order [Docket No. 193]; 6/21/17 Tx. [Docket No. 206]. The court repeatedly pressed Barrilleaux's counsel to confirm whether the claims remaining in the case were accurately reflected in the case management statement, and expressed concern that at this point in the case, (i.e., at summary judgment following settlement of all claims against the Judicial Defendants), the claims should not be a moving target. Barrilleaux's counsel represented that, in addition to a claim for attorneys' fees and costs, the three remaining claims against the County are the claims that were identified in the County's case management statement: 1) injunctive relief requiring the County to build a second set of accessible restrooms in the courthouse, and to require the County to consent to the Judicial Defendants' modifications of the 5th floor restroom; 2) injunctive relief requiring the County to train its security guards to accommodate the needs of disabled persons seeking access to superior court proceedings; and 3) damages arising out of the difficulties Barrilleaux experienced using the 5th floor restroom. 6/21/17 Civil Conference Min. Order; 6/21/17 Tx. at 7:9-8:3; Def.'s Separate Case Management Statement at 6:5-10 [Docket No. 189]. Barrilleaux's counsel did not identify a claim for installation of stair lifts, despite ample opportunity to do so. Therefore, the court will not consider that claim at this late juncture.

The County next contends that the court should refuse to consider any claims arising out of Barrilleaux's interaction with the security guard because she did not disclose this new legal theory

in the FAC or in her discovery responses. Barrilleaux disagrees, arguing that this is not a new legal theory, but rather another example of the County's deliberate indifference. The court agrees with the County. The record demonstrates that Barrilleaux presents this as a separate legal theory, not merely as further evidence of the County's intent. Her summary judgment papers are replete with arguments and descriptions of her interaction with the security guard as another basis for liability against the County. *See, e.g*., Pl.'s Opp'n and Cross-Mot. for Summ. J. at 8, 13, 15, 24; *see also* Pl.'s Reply at 14-15. She was required to disclose this legal theory either in the operative complaint or in her discovery responses. *See Pickern v. Pier 1 Imports (U.S.), Inc*., 457 F.3d 963, 968-69 (9th Cir. 2006) (the plaintiff failed to give adequate notice of new ADA allegations where the new allegations were not in the complaint); *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292-94 (9th Cir. 2000) (the plaintiffs did not give the defendant adequate notice of the new legal theory when they raised it for the first time at the summary judgment stage of the case). Barrilleaux did neither. The FAC does not contain any allegations about her interaction with the security guard. Additionally, none of her discovery responses discuss this interaction, or identify the County's alleged failure to train its security guards. *See, e.g.,* Pl.'s Resp. to Interrog. No. 1 in Def.'s First Set of Interrogs. (Ex. N) to Suppl. Keck Decl. [Docket No. 201-6] ("Describe each incident which you contend constituted discrimination against you by the County on the basis of your disability."); Pl.'s Resp. to Interrog. No. 2 in Def.'s First Set of Interrogs. (Ex. N) to Suppl. Keck Decl. ("Identify each individual who is a witness to each incident in which you contend the County discrimination [sic] against you . . . on the basis of your disability."); Pl.'s Resp. to Interrog. No. 11 in Def.'s First Set of Interrogs. (Ex. N) to Suppl. Keck Decl. ("If you contend that the County is liable to you for damages due to deliberate indifference, state all facts upon which you base . . . that contention."). Therefore, the court will not consider any claims arising out of Barrilleaux's interaction with the security guard.

The County contends that Barrilleaux did not provide adequate notice of any claims arising out of her difficulty using the 5th floor restroom. It also requests that the court disregard Barrilleaux's supplemental declaration regarding her deposition testimony as a "sham" declaration. Barrilleaux disagrees, and argues that her supplemental declaration merely clarifies

her prior testimony. Having reviewed the First Amended Complaint ("FAC"), the court finds that it sufficiently alleges that Barrilleaux experienced difficulties using the 5th floor restroom. The FAC identifies the 5th floor Women's Restrooms as a barrier to access, and lists certain characteristics, including the weight of the entry door, the lack of a pull handle, the swinging of the toilet compartment door, the grasping and twisting required to operate the toilet compartment, and the height of the grab bar and coat hook.[4] First Amended Complaint ("FAC") at p.11 [Docket No. 69].

Regarding the alleged "sham" declaration, "the general rule in the Ninth Circuit is that 'a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). However, the "Ninth Circuit has cautioned that courts should not disavow a declaration as a sham for minor contradictions resulting from honest mistake, newly discovered evidence, or credibly refreshed recollection." *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 941 (N.D. Cal. 2016) (citing *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012); *see also Yeager*, 693 F.3d at 1081 ("'[T]he non-moving party is not precluded from elaborating up on, explaining or clarifying prior testimony elicited by opposing counsel on deposition . . . .'") (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009)). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Yeager*, 693 F.3d at 1080 (quoting *Van Asdale*, 577 F.3d at 998-99).

The court determines that Barrilleaux's supplemental declaration is not a sham. The alleged contradiction between the deposition testimony and supplemental declaration may be explained as the result of Barrilleaux's misunderstanding of a question during her deposition. In

---

[4] The County cites to *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) and *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-cv-01282-KJM-AC, 2014 WL 1330754, at *5 (E.D. Cal. Mar. 28, 2014) for the proposition that a plaintiff violates Rule 8 when she raises new facts alleging architectural barriers in support of a Title III ADA claim that were not specifically alleged in the complaint. The County's cases are factually inapposite because here, the FAC specifically identifies the 5th floor restroom as a barrier to disabled access.

the deposition, the County's counsel asked, "All right. And again, not asking for details, did you have any problems accessing the [5th floor] bathroom?," to which Barrilleaux responded: "No." *See* Depo. of Jessica Barrilleaux ("Barrilleaux Depo.") (Ex. 18) at 81:6-9 to Rein Decl. [Docket No. 195-18]. In the supplemental declaration, Barrilleaux explains that she understood the question as asking whether she had difficulties reaching or traveling to the 5th floor restroom. *See* Suppl. Decl. of Jessica Barrilleaux ("Suppl. Barrilleaux Decl.") (Ex. 22) to Rein Decl., ¶ 2 [Docket No. 195-22] ("During these questions the defense attorney asked me whether I had 'any problems accessing the bathroom,' I said, 'no.' I had no trouble following the directions that the security guard gave me to access the fifth floor to get to the fifth floor restroom."). While the County's counsel contends that the word "access" in the question refers to Barrilleaux's use of the 5th floor restroom, Barrilleaux's understanding of the question as referring to her ability to travel to the 5th floor restroom is not unreasonable, given that she was previously asked whether the security guard informed her how to "access the fifth floor or the fourth floor . . . ." *See* Barrilleaux Depo. (Ex. 18) at 79:14-19 to Rein Decl. Therefore, the court will consider claims arising out of her difficulty using the 5th floor restroom.

The County argues that Barrilleaux failed to give fair notice in the FAC of a claim for injunctive relief requesting a second set of accessible restrooms, as required by *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011). According to the County, Barrilleaux first articulated her request for a second set of restrooms in her expert's report, which is inadequate notice under *Oliver*. Barrilleaux disagrees, arguing that the FAC proved fair notice of this claim. According to Barrilleaux, the FAC alleges that alterations took place in the courthouse, which triggered the County's obligation to provide accessible paths of travel and restrooms including a second set of accessible restrooms.

"Under Rule 8, 'a plaintiff must identify the barriers that constitute the grounds for a claim of discrimination under the ADA in the complaint itself; a defendant is not deemed to have fair notice of barriers identified elsewhere.'" *Gray v. Cty. of Kern*, No. 1:14-cv-00204-LJO-JLT, 2015 WL 7352302, at *10 (E.D. Cal. Nov. 19, 2015), *aff'd in part, rev'd in part and remanded on other grounds by* 704 F. App'x 649 (9th Cir. July 31, 2017) (quoting *Oliver v. Ralphs Grocery Co.*, 654

F.3d 903, 909 (9th Cir. 2011)); *see also Pickern*, 457 F.3d at 968–69 (a complaint that only provided examples of the barriers "a disabled person [could] confront" at the defendant's premises violated Rule 8 because it did not provide the defendant with fair notice of the actual barriers upon which the plaintiff based her claim). Having reviewed the FAC, the court finds that it provides adequate notice of the lack of a second set of disability accessible restrooms as a barrier. The FAC alleges that there is "[o]nly one set of restrooms in the building [that] are accessible," and those restrooms are on the 5th floor. FAC at pp. 10-11. While Barrilleaux's wording could have been more direct, the court finds that the allegation that "[o]nly one set of restrooms in the building are accessible" fairly encompasses a claim for a second set of accessible restrooms.

The County's argument that Barrilleaux's expert report is not the proper vehicle to provide notice of disability barriers under *Oliver* is unpersuasive. In *Oliver*, the Ninth Circuit explained that in *Pickern*, it held that an expert report that was not filed and served until after the discovery deadline, and that failed to specify "what allegations [the plaintiff] was including in the suit," did not constitute adequate notice of the claim to the defendant. 654 F.3d at 908; *see also Pickern*, 457 F.3d at 969. By contrast here, the FAC provides adequate notice of the barrier (lack of a second set of disability accessible restrooms), so there is no need to look to Barrilleaux's expert report. Moreover, the expert report is different from the one in *Pickern.* Ex. 2 to Decl. of Peter Margen in support of Pl.'s Mot. for Prelim. Injunction [Docket No. 103-2]. Unlike *Pickern*, the statements in the Margen expert report are nearly identical to the allegations in the FAC, *see* FAC at pp.10-11, and the report was served within the discovery period. Therefore, the court will consider a claim for injunctive relief requesting a second set of accessible restrooms.

The County contends that the court should not consider any arguments relating to the Unruh Act claim because the FAC did not adequately plead it. Barrilleaux asserts that the FAC adequately disclosed the Unruh claim because paragraphs 3 and 9 cite to California Civil Code Section 51, otherwise known as the Unruh Act, and her claims incorporate paragraphs 3 and 9 by reference. She also argues that it is unnecessary to plead a separate Unruh claim because any violation of the ADA is also a violation of Section 51(f) of the Unruh Act, which expressly incorporates the ADA.

18

The court finds that Barrilleaux has not adequately pleaded an Unruh Act claim. There is no separate Unruh claim alleged in the FAC. Moreover, the FAC fails to allege the specific acts upon which Barrilleaux bases an Unruh claim. Under Rule 8(a), the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to state the specific acts of the defendant that violated the plaintiff's rights fails to meet the notice requirements of Rule 8(a). *See Hutchinson v. United States*, 677 F.2d 1322, 1328 n.5 (9th Cir. 1982). Barrilleaux's argument that it is not necessary to plead a separate Unruh claim as long as a party pleads a violation of the ADA is unsupported. This confuses rules of liability with rules of pleading. The fact that a violation of the ADA may serve as the substantive basis for a violation of the Unruh Act, *see* Cal. Civ. Code § 51(f), does not relieve a plaintiff of the obligation to adequately plead and disclose the claim under Rule 8. Therefore, the court will not consider an Unruh claim.

In sum, the claims properly before the court on summary judgment are the ADA, Section 504, and state law claims seeking: 1) injunctive relief requesting a second set of accessible restrooms; and 2) damages and injunctive relief arising out of Barrilleaux's difficulty using the 5th floor restroom. The court construes the request for injunctive relief arising out of Barrilleaux's difficulty in using the 5th floor restroom as a request to require the County to consent to the Judicial Defendants' modification of the 5th floor restroom because Barrilleaux has not identified any other injunctive relief related to the 5th floor restroom. *See* 6/21/17 Tx. at 7:9-8:3; Def.'s Separate Case Management Statement at 6:5-10. The court finds that Barrilleaux has abandoned this request because she did not address it in the opposition to the County's motion for summary judgment, or in the cross-motion for summary judgment. *See Cooper*, 82 F. Supp. 3d at 1093 n.2 (ADA plaintiff abandoned claims not raised in opposition to summary judgment) (citing *Jenkins v. City of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).

Accordingly, the court will only consider arguments and evidence related to the two claims remaining in the case: a claim for injunctive relief requiring the County to install a second set of accessible restrooms in the courthouse; and a claim for damages arising out of Barrilleaux's difficulties in using the 5th floor restroom.

### III. BACKGROUND

The facts are undisputed unless otherwise stated. For purposes of this motion, the County has conceded that at all relevant times, Barrilleaux was an individual with a physical disability. On April 23, 2013, she went to the courthouse to appear at a traffic court hearing in courtroom G, which is located on the 4th floor. Because the elevator in the courthouse does not travel directly to the 4th floor, she took the elevator to the 5th floor and walked down one flight of stairs to the 4th floor. At the conclusion of the hearing, she walked down the stairs from the 4th floor to the Clerk's Office on the 1st floor in order to pay a court-ordered fine. When she reached the top of the stairs to the 1st floor, her left knee gave out causing her to fall down the stairs. As a result of the fall, she sustained physical injuries.

In March 2014, Barrilleaux filed this action against the Judicial Defendants and the County, alleging six federal and state claims for disability discrimination. She eventually settled with the Judicial Defendants, leaving only the claims against the County.

In order to understand Barrilleaux's claims against the County, it is necessary to discuss a number of events that occurred prior to and after April 23, 2013, including the construction of the courthouse, the transfer of certain responsibilities regarding the courthouse from the County to the Judicial Defendants, and Barrilleaux's settlement with the Judicial Defendants.

#### A. **History of the Courthouse**

In 1950, a preexisting 1927 court annex was merged with a new building to create the current courthouse. *See* Shaver Decl., ¶ 3. As the courthouse is an amalgam, it possesses certain odd architectural features. For example, there is only one elevator in the entire courthouse, and it only travels to the floors in the newer part of the building, namely Floors 0, 1, 3, and 5. *Id.*, ¶ 10. The elevator does not travel to the floors in the old 1927 court annex, which are the Basement, Ground Floor, and Floors 2 and 4. *Id.*, ¶¶ 9-10. In order to reach the 4th floor, a person must take the elevator to the 5th or 3rd floor and walk down one flight of stairs or up one flight of stairs. *Id.*, ¶¶ 9-13, 18; *see also* Figures 6-10 to Shaver Decl. Since 1956, the only entity that has occupied the 4th floor is the Superior Court. *Id.*, ¶¶ 16-17. The County has never had any offices or departments on the 4th floor from at least 1956 to the present. Shaver Decl., ¶¶ 16-17.

In 1991 and 1996, the County made certain alterations to the courthouse. There is no evidence in the record clearly identifying the floor(s) on which the 1991 alterations occurred, or the exact nature of those alterations. *See, e.g.*, December 1991 Minute Order (Ex. 4) to Rein Decl. [Docket No. 194-4] (discussing the 1991 remodeling, but not identifying the floor(s) on which the remodeling occurred). Regarding the 1996 alterations, the record shows that these involved the construction of a courtroom (courtroom A), and cost of at least $140,000.00.[5] Exs. 5-7 (Cupples Construction invoices) [Docket Nos. 195-5 through 7] and Ex. 10 (Project Notes) to Rein Decl. [Docket No. 195-10]. Although not entirely clear, the record shows that the 1996 alterations likely occurred on the first floor because courtroom A is located on the first floor. *See* 30(b)(6) Shaver Depo. (Ex. 12) at 25:18-27:21 to Rein Decl. (testifying that the 1996 renovations were performed in courtroom A); Shaver Decl. ¶ 14 (identifying courtrooms A and B as located on the first floor of the courthouse).

### 1. Prior Disability Access Complaints About the Courthouse

In 1991, the County received two informal complaints about the courthouse's lack of accessibility. Correll-Rose Decl., ¶ 10. The record only contains information about one informal complaint in a 1991 letter from Attorney Frank R. Broadhead. *See* November 19, 1991 Letter from Attorney Frank R. Broadhead to Dale Hawley (Ex. 24) to Rein Decl. ("November 1991 Letter") [Docket No. 195-24]. In the November 1991 Letter, Broadhead proposed that the County install a lift to address accessibility concerns. On December 9, 1991, Hawley wrote a memorandum to Al Bazzani, Building & Grounds in which he discussed Broadhead's proposal, noting: "As I am sure you must be aware, handicap access regulations do apply to public buildings such as the courthouse." *See* December 9, 1991 Memorandum from Dale Hawley, Code Enforcement Officer, to Al Bazzani, Building & Grounds ("December 1991 Memorandum") (Ex. 25) to Rein Decl. [Docket No. 195-25]. The County did not install the proposed lift.

---

[5] The County argues that the billing is cumulative, and that the total cost of the project is at least $87,460.83, the total of the last invoice (Exhibit 7). *See* Def.'s Reply at 4 n.6 [Docket No. 200]. This appears to be incorrect. With the exception of the overlap in billing on November 5, 1996, each bill covers a separate billing period. Exhibit 6 covers the billing period of 10/7/96 to 10/22/96, Exhibit 5 covers the billing period of 10/23/06 to 11/5/96, and Exhibit 7 covers the billing period of 11/5/96 to 11/17/16.

In 1998, the County entered into a settlement agreement with the United States in response to a complaint filed by the Department of Justice, Civil Rights Division, Disability Rights Section ("DOJ") regarding accessibility issues with the courthouse. Settlement Agreement between the United States of America and Mendocino County, California, Department of Justice Complaint Number 204-11-69 ("1998 DOJ Settlement Agreement") (Ex. 1) to Rein Decl. [Docket No. 195-1]. The DOJ complaint alleged that the courthouse was inaccessible to individuals with mobility impairments in a number of ways. These included the allegation that the door at the accessible entrance of the courthouse was too heavy to open, the mezzanine levels of the building where several courtrooms were located were accessible only by the stairs, the building lacked accessible bathrooms and accessible parking spaces outside the courthouse, and the courthouse lacked accessible public telephones and water fountains. *Id.*

As result of the 1998 DOJ Settlement Agreement, the County agreed to make various modifications, including making at least one set of men's and women's restrooms accessible. *Id.* at BARR 00010 – 12. The County also agreed to adopt a policy to relocate hearings in courtrooms C, F, G, and H to accessible courtrooms upon timely request of a person with a disability, and to publicize the policy to the public:

> In accordance with the requirements of title II of the Americans with Disabilities Act of 1990, Me[n]docino County court proceedings taking place in Courtrooms C, F, G, and H will be moved to an accessible courtroom upon the request of a person with a disability. Such a request to relocate a hearing on the basis of physical accessibility will be granted if requested before the proceeding begins. Requests made after the beginning of a proceeding will be granted if possible. Any individual with a disability needing to request relocation of a proceeding, requiring information, or needing assistance, should contact [name, room, and telephone numbers], for additional information.

*Id.* at BARR 00012.

## 2. Transfer of Responsibilities Regarding the Courthouse

From 1950 to 2002, the County was responsible for the maintenance of the courthouse. *See* Decl. of Brent W. Darymple ("Darymple Decl."), ¶ 4 (Ex. F) to Keck Decl. [Docket No. 169-6]. This changed in 2002 with the enactment and implementation of the Trial Court Facilities Act

22

of 2002 ("TCFA")), Cal. Gov't Code § 70301 *et seq*.

"The Trial Court Facilities Act of 2002 shifted responsibility for California trial court facilities from individual counties to the state Judicial Council." *Placerville Historic Pres. League v. Judicial Council of Cal.*, 16 Cal. App. 5th 187, 190–91 (2017). The TCFA required the Judicial Council to enter into agreements "regarding the transfer of responsibility for court facilities from that county to the Judicial Council" to be executed no later than December 31, 2009, with transfer of responsibilities to occur no later than December 31, 2009. Cal. Gov't Code § 70321(a). The TCFA defined "[c]ourt facilities" to include "[r]ooms for holding superior court," and "[c]ommon and connecting space to permit proper and convenient use of the rooms." Cal. Gov't Code § 70301(d)(1), (5). It also defined "[r]esponsibility for facilities" to include "the obligation of providing, operating, maintaining, altering, and renovating a building that contains the facilities." Cal. Gov't Code § 70301(h). Under the TCFA, a county was generally "relieved of any responsibility" to provide court facilities, or maintain them upon the transfer of court facilities from a county to the Judicial Council. Cal. Gov't Code § 70312.

The TCFA also permitted a county to retain title to buildings used for court and county functions. If a county chose to retain title, the Judicial Council was then required to enter into an agreement with the county to delineate the rights and responsibilities of each. Cal. Gov't Code § 70323(b)(1) (establishing that a county may continue to own title to a building housing court facilities); § 70343 (a)(1) ("Notwithstanding the manner of holding title to a shared use building: (1) The rights and responsibilities of the Judicial Council, the court, and the county in a shared use building shall be established by an agreement between the Judicial Council and the county which may be modified by the consent of both the Judicial Council and the county.").

In 2008, the County and the Judicial Defendants entered into a Transfer Agreement and Joint Occupancy Agreement ("JOA") through which the County retained title to the courthouse, while certain responsibilities for the maintenance and operation of the courthouse transferred from the County to the Judicial Defendants pursuant to the TCFA. *See* Darymple Decl., ¶ 4 (Ex. F) to Keck Decl.; Transfer Agreement between the Judicial Council of California, Administrative Office of the Courts and the County of Mendocino for the Transfer of Responsibility for Court

Facility (Ex. D) ("Transfer Agreement") to Shaver Decl. [Docket No. 167-4]; Joint Occupancy Agreement between the Judicial Council of California, Administrative Office of the Courts and the County of Mendocino ("JOA") (Ex. E) to Shaver Decl. [Docket No. 167-5].[6] The Transfer Agreement defines "transfer of responsibility" as the "County's full and final grant, transfer, and absolute assignment, and conveyance to the applicable State Parties, and the State Parties' full and final acceptance and assumption of, entitlement to, and responsibility for, all of the County's rights, duties, and liabilities arising from or related to the Court Facility under this Agreement, and the [TCFA], except for those duties and liabilities expressly retained by the County under this Agreement and the [TCFA] . . . ." Transfer Agreement at p.6 (Ex. D) to Shaver Decl.

Pursuant to the JOA, the County and the Judicial Defendants both have the right to "exclusively occupy and use" their own exclusive-use areas, as well as the non-exclusive right to occupy and use the Common Area. *See* JOA, ¶ 3.1 (Rights to Exclusive-Use Area and Common Area), (Ex. E) to Shaver Decl. The "Common Area" includes "(1) the hallways, stairwells, elevators, escalators, and restrooms that are not located in either Party's Exclusive-Use Area . . . ." *Id*. at p.1 (Definition of "Common Area"). The Judicial Defendants are responsible for the operation of the Common Area, which includes its "administration, management, maintenance, and repair." JOA, ¶ 3.2.2 (Common Area*); Id.* at p.4 (definition of "Operation"). If the "maintenance, repair, or replacement of any equipment, fixture, or other property located in the common area" exceeds $2,500, the Judicial Defendants are required to obtain the "written consent" of the County. *Id.*

---

[6] Barrilleaux argues that the County failed to honor the 1998 DOJ Settlement Agreement and falsely represented to the Judicial Defendants at the time of the Transfer Agreement that the courthouse complied with all state and federal laws when it did not. *See* Pl.'s Opp'n and Cross-Mot. for Summ. J. at 6. This argument is unsupported. There are no facts in the record showing that the County knew that it was not in compliance with the 1998 DOJ Settlement Agreement at the time it signed the Transfer Agreement in December 2008. The only evidence Barrilleaux identifies is the April 23, 2013 Request to Calendar Case and paragraphs 5 and 8 of Barrilleaux's Declaration in support of Barrilleaux's Motion for Preliminary Injunction describing her own observations about the absence of notice regarding accommodations on April 16, 2013 and April 23, 2013. *Id*. This evidence is not probative of the state of compliance in 2008 or the County's purported knowledge of compliance at that time.

### 3. Barrilleaux's April 2013 Visits to the Courthouse

Barrilleaux visited the courthouse on April 16 and 23, 2013. On April 16, 2013, Barrilleaux went to the courthouse to obtain a hearing date for a traffic ticket. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 36:22-37:4 [Docket No. 169-1]. Because of an earlier left knee injury, she needed crutches to ambulate.[7] *Id.* at 37:5-12, 46:7-10. Upon her arrival, she asked a security guard how to get to the Clerk's office. *Id.* at 55:12-14; *see also* Barrilleaux Depo. Vol. II (Ex. B) to Keck Decl. at 294:9-11 [Docket No. 169-2]. The security guard told her that the Clerk's Office was on the floor directly above them, and that in order to get there, she could either walk to the other side of the building and take the elevator up, or walk up one flight of stairs, which were closer to her. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 36:22-37:4 55:15-22; Barrilleaux Depo. Vol. II (Ex. B) to Keck Decl. at 294:24-295:11. She decided to walk up one flight of stairs to the Clerk's Office using her crutches. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 55:23-56:4; Barrilleaux Depo. Vol. II (Ex. B) to Keck Decl. at 294:12-15. At the Clerk's Office, she completed a "Request to Calendar Case" to have her matter heard in traffic court on April 23, 2013 in courtroom G. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 56:13-18; 59:14-60:17, 68:16-69:2; Request to Calendar Case (Ex. 5) to Barrilleaux Depo. [Docket No. 169-1]. She exited the Clerk's Office the same way she came in, namely by descending the stairs. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 70:1-12.

On April 23, 2013, Barrilleaux returned to the courthouse to attend her scheduled traffic court hearing. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 74:5-7. On this visit, she wore a large left knee brace on the outside of her pants. *Id.* at 78:1-9; 80:14-18. A day or two before the April 23 courthouse visit, Barrilleaux's doctor told her that her left knee was completely healed and that she did not need to use crutches, but should use a knee brace. *Id.* at 47:12-48:4. Upon exiting the security line to enter the building, she asked one of the security guards where she could find courtroom G and a bathroom. *Id.* at 78:15-21. A security guard told her that courtroom G

---

[7] In March 2013, Barrilleaux fractured her left kneecap in three places, which required surgery and the installation of four screws. *See* Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 39:2-24, 43:5-11; March 15, 2013 Operative Note (Ex. 1) to Yu Decl.

was on the 4th floor, but that in order to get there, she would have to take the elevator to the 5th floor and walk down one flight of stairs because the elevator only traveled to the 3rd and 5th floors. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 79:11-19. The security guard also informed her that the accessible bathroom was on the 5th floor. *Id*. at 79:9-10, 80:19-21. She took the elevator to the 5th floor to use the restroom. *Id*. at 81:1-5. Because of her disability, she had difficulty using the 5th floor restroom. For example, she had a hard time opening the heavy entry door, and reaching for the toilet paper. *See* Barrilleaux Suppl. Decl., ¶ 4. After using the restroom, she walked down one flight of stairs to the 4th floor to courtroom G to attend the traffic court hearing. Barrilleaux Depo. Vol. I (Ex. A) to Keck Decl. at 81:10-14. At the traffic court hearing, the judge issued her a fine and the judicial assistant told her to pay the fine at the Clerk's Office on the 1st floor. *Id*. at 81:15-82:5, 82:11-83:5.

Upon the conclusion of the hearing, Barrilleaux walked down the stairs from the 4th floor to the 1st floor to pay the fine. *Id*. at 85:11-18, 86:23-87:4. Although she knew that there was an elevator on the 3rd floor that traveled to the 1st floor, she did not ask anyone for directions on how to get to 3rd floor elevator at the time because she was confused by the layout of the building. *Id*. at 87:5-88:5. When she arrived at the top of the flight of stairs to the 1st floor, her left kneecap shot forward, causing her to fall down the stairs. *Id*. at 88:9-25; Barrilleaux Depo. Vol. II (Ex. B) to Keck Decl. at 133:8-20, 299:7-300:24.

As a result of the April 23, 2013 fall, Barrilleaux underwent surgery on her left knee. April 26, 2013 Operative Note (Ex. 2) to Yu Decl.

## B. Relevant Procedural History

On March 24, 2014, Barrilleaux filed this lawsuit against the County and the Judicial Defendants alleging six federal and state claims against all Defendants: 1) discrimination in violation of Title II of the ADA; 2) violation of Section 504; 3) violation of the CDPA; 4) violation of California Government Code § 11135 (discrimination under program receiving financial assistance from the state); 5) dangerous condition of public property; and 6) negligence. Compl. [Docket No. 1]. The case was assigned to the Honorable Thelton E. Henderson.

On January 15, 2016, in response to the order on Defendants' motion to dismiss,

Barrilleaux filed the operative First Amended Complaint ("FAC"). [Docket No. 69]. In the FAC, Barrilleaux dropped her state law claims against the Judicial Defendants because the court dismissed those claims on July 25, 2014. *See* July 25, 2014 Order Granting in Part and Denying in Part Court Defs.' Mot. to Dismiss [Docket No. 25]. She included additional allegations identifying the barriers to disabled access at the courthouse pursuant to *Oliver v. Ralphs Grocery Company*, 654 F.3d 903, 909 (9th Cir. 2011). FAC, ¶ 19.

Nearly six months later, on July 1, 2016, Barrilleaux filed a motion for preliminary injunctive relief in which she requested a mandatory injunction requiring Defendants to provide stair lift access to the 4th floor courtrooms. [Docket No. 99]. Judge Henderson denied Barrilleaux's motion because she failed to meet the heightened standard for granting a mandatory injunction. *See* August 15, 2016 Order Denying Pl.'s Mot. for Prelim. Injunction.

In early 2017, Barrilleaux entered into a settlement with the Judicial Defendants. *See* Stipulation of Settlement and Order for Dismissal with Prejudice as Against Defendants Superior Court of California, County of Mendocino and Judicial Council of California [Docket Nos. 154, 157]. Pursuant to the Court Enforceable Settlement Agreement and Release of Claims ("Judicial Defendants' Settlement Agreement"), the Judicial Defendants agreed to make the following structural modifications to the courthouse requested in paragraph 19 of the FAC, by July 15, 2017:

> Fifth Floor Restroom:
> a. Adjust restroom entry door force to 5 lbs maximum.
> b. Install a pull handle on the accessible toilet compartment door.
> c. Replace the accessible toilet compartment door.
> d. Reverse the swing of the accessible toilet compartment door.
> e. Relocate the side grab bar in the accessible toilet compartment so that the front of the bar extends 54'' minimum from the rear wall.
> f. Relocate the toilet paper dispenser in the accessible toilet compartment to within 7-9'' to the centerline of the dispenser from the front edge of the toilet.
> g. Lower the coat hook to 48'' AFF maximum in the accessible toilet compartment.

Judicial Defendants' Settlement Agreement, ¶¶ 6.1, 6.3 (Ex. H) to Keck Decl. [Docket No. 169-8]; *see* FAC ¶ 19.

The Judicial Defendants also agreed to make a number of programmatic modifications to

courthouse services by July 15, 2017, including the adoption of disability-accommodation signage and notice throughout the courthouse and in communications with the public, and training personnel to respond to the disability-accommodation signage. Judicial Defendants' Settlement Agreement, ¶¶ 7.1(1) through (4). The Judicial Defendants completed physical modifications to the 5th floor restrooms and added the agreed-upon signage in the courthouse in July 2017. *See* Decl. of Daniel Mazzanti ("Mazzanti Decl.), ¶ 5 [Docket No. 202].

Following the dismissal of the Judicial Defendants, the County filed a motion for summary judgment. [Docket No. 166]. Barrilleaux filed her opposition and cross-motion for summary judgment. [Docket No. 197]. On June 8, 2018, the court ordered the parties to submit supplemental briefing in connection with the pending cross-motions for summary judgment, which the parties timely filed. [Docket Nos. 208, 209, 210].

## IV.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252;

conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

Where, as here, the parties file cross-motions for summary judgment, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation and internal quotation marks omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id*.

## V. DISCUSSION

### A. The County's Motion for Summary Judgment

The County moves for summary judgment on the remaining claims. The County's central argument is that it is not responsible for the relief that Barrilleaux seeks because, pursuant to the 2008 JOA and Transfer Agreement, it transferred all responsibility for the maintenance of the courthouse to the Judicial Defendants, who have already settled with Barrilleaux. To the extent that the County had obligations to make the courthouse accessible that it had not fulfilled at the time of the 2008 transfer of responsibility, it contends that the Judicial Defendants assumed those obligations under the JOA and the Transfer Agreement. The County also argues that the claim for injunctive relief fails for lack of Article III standing and mootness, and that the ADA, Section 504, and state law claims fail on their merits.

Barrilleaux disagrees. She argues that the County had an obligation to perform structural modifications to make the courthouse accessible, including installation of a second set of accessible bathrooms. Barrilleaux contends that pursuant to the ADA's implementing regulations, 28 C.F.R. § 35.150(a)(1) and 28 C.F.R. § 35.151, this obligation was triggered by the County's 1991 and 1996 building renovations, as well as its pre-2013 construction work on the 4th floor. Barrilleaux argues that the County could not "transfer" its obligations under the ADA to the Judicial Defendants through the Transfer Agreement, because such obligations are non-delegable. Thus, according to Barrilleaux, the County remains responsible for installing a second set of

United States District Court
Northern District of California

accessible restrooms. She also argues that there are triable disputes regarding the ADA, Section 504, and state law claims that preclude summary judgment.

The parties' primary arguments on the remaining claims boil down to two issues: 1) did the County have an obligation to install a second set of accessible restrooms in the courthouse as a result of the 1991 or 1996 renovations, and/or pre-2013 construction work on the 4th floor, and 2) if so, did the County retain this obligation, as well as liability for damages relating to Barrilleaux's difficulties in using the 5th floor restroom, notwithstanding the 2008 transfer of certain responsibilities pursuant to the JOA and the Transfer Agreement?

In order to address these questions, it is necessary to examine the ADA framework in which this case is grounded. This includes an analysis of whether it is possible[8] that the ADA implementing regulations imposed a duty on the County to make a second set of accessible bathrooms that was triggered by the 1991 or 1996 renovations, and/or the pre-2013 construction work on the 4th floor. If no triable issue exists on this foundational issue, the court need not reach many of the arguments raised in the motions. If there is a triable dispute on the existence of such a duty, the court will then consider whether the County continued to retain such a duty after the County entered into the JOA and Transfer Agreement with the Judicial Defendants in 2008. The court will then address the remaining substantive arguments raised in the County's motion.

### 1.    The ADA

The ADA is intended to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); Pub. L. 101-336, § 2, July 26, 1990. The ADA has three separate titles; relevant to this action is Title II, which regulates state and local governments that operate public services or programs.

Under Title II, a "qualified individual with a disability" cannot be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" "by reason of such disability." 42 U.S.C.

---

[8] The parties failed to address or provide legal analysis on many foundational issues. As a result, the court resorts to phrases like "it appears," and "it is possible" throughout this order as necessary.

30

§ 12132. The emphasis in Title II is on "program access." *Cohen v. City of Culver City*, 754 F.3d 690, 694-95 (9th Cir. 2014) ("program access" means that a "public entity's programs and services, viewed in their entirety, must be equally accessible to disabled persons") (citing *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1215-16, 1222 (9th Cir. 2008)). Accordingly, a "public entity must make reasonable modifications to avoid discrimination against persons with disabilities, unless it can demonstrate that doing so would fundamentally alter the nature of the service, program, or activity it provides." *Cohen*, 754 F.3d at 695 (citing 28 C.F.R. § 35.130(b)(7)); *McGary v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004)).

Title II's implementing regulations specify that an "individual is excluded from participation in or denied the benefits of a public program if 'a public entity's facilities are inaccessible to or unusable by individuals with disabilities.'" *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 985 (9th Cir. 2014) (quoting 28 C.F.R. § 35.149). Two regulations govern accessibility for the purposes of Title II: 28 C.F.R. § 35.150, which covers existing facilities (pre-January 26, 1992); and 28 C.F.R. § 35.151, which covers newly constructed facilities and alterations (post-January 26, 1992).

### a. Existing Facilities- 28 C.F.R. § 35.150

For existing facilities constructed before January 26, 1992, 28 C.F.R. § 35.150 requires a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). A public entity may comply with section 35.150 in a variety of ways, and "is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150(b)(1). However, as discussed below, when a public entity makes alterations to an existing building, it must comply with the accessibility requirements of section 35.151. 28 C.F.R. § 35.150(b)(1).

The "ADA regulations recognize that 'in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services.'" *Kirola v. City & Cty. of San*

*Francisco*, 74 F. Supp. 3d 1187, 1199 (N.D. Cal. 2014), *aff'd in part, rev'd in part on other grounds*, 860 F.3d 1164 (9th Cir. 2017) (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)).

### b.    New Construction and Alterations - 28 C.F.R. § 35.151

For new construction built after January 26, 1992, 28 C.F.R. § 35.151 requires that "[e]ach facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, . . . ." 28 C.F.R. § 35.151(a)(1).  In order to be "readily accessible," "the facility must be constructed in conformance with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, or with the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101–19.6, App. A." *Kirola*, 74 F. Supp. 3d at 1199 (citation and internal quotation marks omitted).

For alterations to existing facilities made after January 26, 1992, 28 C.F.R. § 35.151 (b)(1) requires that "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities . . . ."

The plain language of section 35.151 makes clear that it is the "'alteration' . . . [that] triggers the [public entity's] compliance requirements" under 28 C.F.R. § 35.151.  *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp*., No. C 06-5125 SBA, 2009 WL 2392156, at *7 (N.D. Cal. Aug. 4, 2009).  Although "alteration" is not a defined term, at least one circuit has construed it to mean a "'change that affects the usability of the facility involved'" based on the plain language of section 35.151.  *Disabled in Action of Penn. v. Se. Penn. Transp. Auth*., 635 F.3d 87, 93 (3d Cir. 2011) (quoting *Kinney v. Yerusalim*, 9 F.3d 1067, 1072–73 (3d Cir. 1993)); *see, e.g*., *Ass'n for Disabled Ams. v. City of Orlando*, 153 F. Supp. 2d 1310, 1320 (M.D. Fla. 2001) (finding that the renovations to the concession stands in the Orlando Arena did not "trigger a duty to bring the concession stands into compliance with ADA guidelines" under Title II; explaining that the "installation of the pizza ovens did not affect patrons' usability of the concession stands, and the replacement of the formica on the counter tops was such a minor alteration that it did not

significantly affect the usability of the counters"). "'Usability' in [the Title II context] has 'an expansive, remedial construction' and 'should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access.'" *Disabled in Action of Penn.*, 635 F.3d at 93 (quoting *Kinney*, 9 F.3d at 1072-73).

Section 35.151 also requires that the "paths of travel" to those altered areas, which include the restrooms serving the altered areas, are accessible "unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration." 28 C.F.R. § 35.151(b)(4); § 35.151(b)(4)(ii) (A "path of travel" is "a continuous, unobstructed way of pedestrian passage by means of which the altered area may be approached, entered, and exited, and which connects the altered area with an exterior approach (including sidewalks, streets, and parking areas), an entrance to the facility, and other parts of the facility."); § 35.151(b)(4)(ii)(B) (The term "path of travel" includes "restrooms, telephones, and drinking fountains serving the altered area.").

### 2. The 1991 and 1996 Renovations, and Pre-2013 Construction Work on the 4th Floor

The court will now attempt to apply these regulations to the record evidence regarding the County's 1991 and 1996 renovations, and pre-2013 construction work on the 4th floor, to determine if there is a triable dispute that any of this work created an obligation on the part of the County to install a second set of accessible bathrooms in the courthouse.

### a. 1991 Renovation

The record contains scant facts on the 1991 renovation. The only document in the record that discusses the 1991 renovation is a December 17, 1991 Minute Order from the County's Board of Supervisors. According to this document, the 1991 renovation involved the remodeling of existing County office space into needed court space. *See* Ex. 4 to Rein Decl.; Pl.'s Opp'n and Cross-Mot. for Summ. J. at 3:18-20. There are no facts in the record clearly identifying on what floor(s) this remodeling occurred, the extent of the remodeling, and what areas of the courthouse were affected.[9]

---

[9] Barrilleaux suggests that the 1991 alterations may have been made on the 2nd and 3rd floors of the courthouse, citing a January 8, 1992 Letter from Byer to Bazzani (Ex. 23). However, the letter does not clearly state what floors the remodeling occurred; instead, it obliquely references other

Since the courthouse was constructed before January 26, 1992, and the 1991 renovation also occurred before that date, it appears that section 35.150 may apply. Under this regulation, the County must "operate each service, program, and activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). The regulation does not require the County to "make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150(b)(1).

It appears that the 1991 remodeling of office space into court space likely affected the usability of the courthouse on the floor on which the renovation occurred, because it increased the space used by the court. Accordingly, it is possible that the 1991 renovation triggered some duty under the ADA to make accessibility modifications. Barrilleaux points to Exhibit 4 as proof positive that the 1991 renovation triggered a duty under the ADA to make the modifications she requests, i.e., the installation of a second set of accessible restrooms. *See, e.g.*, Pl.'s Opp'n and Cross-Mot. for Summ. J. at 4:11-21. This argument overreaches. Exhibit 4 is a Minute Order from the County's Board of Supervisors dated December 17, 1991. Ex. 4 to Rein Decl. It contains statements from County Administrator Scannell that the remodeling of existing office space for court space (presumably the 1991 renovation) "failed to address the issue of handicapped accessibility as required by law," and that "because of budget constraints, the former CAO made the determination that the accessibility requirements would not be addressed." *Id.* Assuming that Scannell's statements are not hearsay, at best, they can be used to show the County's awareness that the 1991 renovation triggered some duty under the ADA. However, the statements do not prove that such a duty included the installation of a second set of accessible restrooms. In any event, the County does not move for summary judgment on this issue, so the court declines to address it other than to identify the existence of a factual dispute regarding whether the 1991 renovation created an accessibility obligation for the County.

//

documents that discuss remodeling of the 2nd and 3rd floors. The parties did not submit facts describing how these two floors have been used during the relevant period.

### b.    1996 Renovation

The record also contains scant facts on the 1996 renovation.  According to the contractor's billing invoices and notes, and an October 10, 1996 outline of specifications and details, the 1996 renovation involved the conversion of existing office space into a courtroom, namely courtroom A.  *See* Exs. 5-7 (Cupples Construction billing invoices); 10 (Project Notes); 16 (October 10, 1996 outline specifications and details) to Rein Decl.  Although not entirely clear, the record shows that these alterations likely occurred on the first floor because courtroom A is located on the first floor.  *See* 30(b)(6) Shaver Depo. (Ex. 12) at 25:18-27:21 to Rein Decl. (testifying that the 1996 renovations were performed in courtroom A); Shaver Decl. ¶ 14 (identifying courtrooms A and B as located on the first floor of the courthouse).  Thus, it appears that the 1st floor is occupied at least in part by the Judicial Defendants, but the record is unclear as to whether the County also occupies the 1st floor.

Construing these scant facts in Barrilleaux's favor as the non-moving party, it is possible that the 1996 remodeling triggered an obligation under section 35.151(b)(1) to make the remodeled area accessible, which could include the installation of accessible restrooms.[10]  The court does not reach this question other than to identify the existence of a factual dispute, because the County did not move for summary judgment on it.  Instead, the County argues that the 2008 transfer of responsibilities to the Judicial Council absolved it of any responsibility related to the courthouse.  This argument is addressed further below.

### c.    Pre-2013 Construction Work on 4th Floor

Barrilleaux also contends that the County performed construction work on the 4th floor "sometime prior to 2013," which triggered the County's obligation under section 35.151(b)(1).  She relies on the County's response to RFA No. 61, where the County admits that "construction

---

[10]  The sparse record leaves a lot of guesswork on the answers to these questions, for the ADA accessibility obligations generally do not extend to entirely unrelated or unaltered areas.  *See, e.g.*, *Mannick v. Kaiser Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 1626909, at *11 (N.D. Cal. June 9, 2006) (granting summary judgment on Title III claims; finding that the "1993 remodeling of the 4th/5th floor labor/delivery rooms did not trigger any obligation with regard to the patient rooms on the medical-surgical floors [unrelated floors]"); *Cherry v. City Coll. of San Francisco*, No. C 04-04981 WHA, 2006 WL 6602454, at *9 (N.D. Cal. Jan. 12, 2006) (rejecting plaintiff's argument in Title II ADA/Section 504 case that "any partial alteration triggers a federal duty to renovate the entire building").

work was performed subsequent to January 1, 1969 and prior to April 23, 2013 on the 4th floor of the subject property." RFA No. 61 (Ex. 3) to Rein Decl. There are no other facts in the record describing the nature or timing of the "construction work" performed on the 4th floor.

The County argues that its response to RFA No. 61 should be construed as admitting only that cosmetic work such as painting was performed on the 4th floor during the relevant time period. Suppl. Keck Decl., ¶ 3 on p.3:1-4. The court sustained Barrilleaux's evidentiary objection to Keck's declaration on this point, and cannot consider it in evaluating the County's motion.

Since there are no record facts describing the "construction work" performed on the 4th floor, or specifying when it was performed (i.e., pre- or post-1992), the court cannot determine whether the "construction work" constitutes a change that affects the usability of the facility that triggered any accessibility obligations under one of the two governing regulations.

In sum, the court finds that numerous factual disputes remain as to whether the County had a duty to install a second set of accessible restrooms as a result of the 1991 or 1996 renovations, or pre-2013 construction work on the 4th floor.

### 3. Liability for Maintenance and Improvement of the Courthouse

Since there are triable disputes regarding whether the County performed work that triggered a duty to install a second set of restrooms, the court now turns to the County's central argument in its motion. The County argues that even if it had any obligation under the ADA to install a second set of accessible restrooms, it did not retain that obligation after 2008. According to the County, the 2008 Transfer Agreement and JOA transferred all responsibility for maintenance and repair of the Common Area to the Judicial Defendants. The County claims that the Common Area includes the restrooms, hallways, stairways, and elevators of the courthouse, which are the areas Barrilleaux encountered on her visits to the courthouse and form the basis for her claims against the County.

In support of its argument, the County points to the definition of "transfer of responsibility" under the Transfer Agreement, the definition of "Common Area" under the JOA, and Section 3.2.2 of the JOA. The Transfer Agreement defines the "transfer of responsibility" as the "County's full and final grant transfer, absolute assignment, and conveyance" to the Judicial

36

Defendants, and the Judicial Defendants' "full and final acceptance, and assumption of, entitlement to and responsibility for, all of the County's rights, duties, and liabilities arising from or related to the County Facility under [the Transfer Agreement] and the [TCFA], except for those duties and liabilities expressly retained by the County under [the Transfer Agreement] and the [TCFA], and Disputes related to facts or circumstances occurring prior to the Closing Date."[11] Transfer Agreement (Ex. D) to Shaver Decl. at p.6 (emphasis added). The JOA defines the "Common Area" as the "(1) the hallways, stairwells, elevators, escalators, and restrooms that are not located in either Party's Exclusive-Use Area . . . ." JOA (Ex. E) to Shaver Decl. at p.1 (Definition of "Common Area"). Under Section 3.2.2 of the JOA, the Judicial Defendants assume responsibility for the "administration, management, and repair" of the Common Area in the courthouse. *Id.* at p.1, ¶ 3.2.2 (Common Area); *see also id.* at p.4 (definition of "Operation"). Thus, according to the County, the 2008 Transfer Agreement and JOA transferred to the Judicial Defendants all responsibility for maintenance and repair for any restroom that Barrilleaux encountered or was entitled to encounter on April 23, 2013, because restrooms are part of the Common Area under the JOA.[12]

"Contract interpretation is a matter of law and 'solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence.'" *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1175 (C.D. Cal. 2009) (quoting *Superior*

---

[11] The Closing Date is December 23, 2008. Transfer Agreement at 1, 23 (explaining that the Closing Date is the "date on which [the Transfer Agreement] and the Closing Documents [were] signed by the last of the Parties to sign them").

[12] The parties seem to assume that their dispute only implicates Common Area, but that is not necessarily the case. Under the JOA, if an area is exclusively used by one entity (the County or Judicial Defendants), then that party is solely responsible for the maintenance of that area. *See* JOA (Ex. E) to Shaver Decl., ¶ 3.2.1 ("[E]ach Party is responsible for the Operation of its Exclusive-Use Area at its sole cost and expense."). Thus, if an alteration occurred in an area that is exclusively used by one party (the County or the Judicial Defendants), and triggered an obligation under the ADA implementing regulations to make modifications to that area, the exclusive-use party may be responsible for making the necessary modifications to that area pursuant to the JOA. *Id.* ("Each Party may make alterations and additions to its Exclusive-Use Area, as long as those alterations and additions do not unreasonably interfere with the other Party's use of its Exclusive-use Area or the Common Area."). Therefore, it remains possible that if alterations triggered the County's obligations under the ADA, they may have occurred in an area exclusively used by one entity, and not involving a Common Area.

*Dispatch, Inc. v. Ins. Corp. of New York*, 176 Cal. App. 4th 12, 31 (2009)).

Under California law, a contract is to be interpreted so as "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636; *Am. Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006) ("The mutual intention of the contracting parties at the time the contract was formed governs."). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible," subject to other provisions governing interpretation. Cal. Civ. Code § 1639. In order to ascertain the intention of the parties, the language of a contract governs its interpretation, "if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Cal. Civ. Code § 1644.

To the extent that the County suggests that it retained little responsibility for the maintenance of the courthouse after 2008, its characterization of the Transfer Agreement and the JOA is incorrect. The County focuses on certain contractual terms but ignores others. The Transfer Agreement is the instrument that transferred responsibilities regarding the courthouse from the County to the Judicial Defendants, *see* Cal. Gov't Code § 70321(a). It defines the scope of the transferred responsibilities, and broadly defines the "transfer of responsibility" as the "County's full and final grant transfer, absolute assignment, and conveyance" to the Judicial Defendants, and the Judicial Defendants' "full and final acceptance, and assumption of, entitlement to and responsibility for, all of the County's rights, duties, and liabilities arising from or related to the County Facility under [the Transfer Agreement] and the [TCFA], except for those duties and liabilities expressly retained by the County under [the Transfer Agreement] and the [TCFA], and Disputes related to facts or circumstances occurring prior to the Closing Date." Transfer Agreement (Ex. D) to Shaver Decl. at p.6.

Notwithstanding this broad language, a close reading of the Transfer Agreement reveals that the County expressly retained duties and liabilities relating to the maintenance of the

United States District Court
Northern District of California

courthouse. For example, the County agreed to retain sole responsibility for damage or destruction to the land, building, and court facility (section 4.3.2) and the "operation, maintenance, and repair of Court Parking under the terms of the JOA," (section 4.3.4). The County is "solely liable and responsible for all non-conforming code conditions of any security-related areas of the Real Property" (section 4.3.5). Additionally, the County retained other responsibilities under the TCFA, which is expressly referenced in the Transfer Agreement, such as managing the "shared-use buildings whose title the county retains under subdivision (b) of Section 70323," making "recommendations to the court and the Judicial Council for the location of new court facilities," and providing "services to local court facilities as provided in the agreement entered into under Section 70322." Cal. Gov't Code § 70393(a) through (c). Thus, contrary to the County's contention, the County retains considerable responsibilities for the courthouse following the 2008 transfer.

To the extent that the County contends that it has no responsibility for the claims in this case because Barrilleaux's claims pertain to the Common Area, which is the sole responsibility of the Judicial Defendants, there are numerous triable disputes that preclude summary judgment on this issue because there are insufficient facts in the record to apply the terms of the JOA to allocate responsibility.

The JOA delineates the rights and responsibilities between the County and the Judicial Defendants over the operation of the courthouse. Under the JOA, the Judicial Defendants and the County have the right to occupy their own exclusive-use areas in the courthouse, and the non-exclusive right to occupy and use the Common Area. JOA (Ex. E) to Shaver Decl., ¶ 3.1. If an area is exclusively used by one entity (the County or Judicial Defendants), then that party is solely responsible for the maintenance of that area. *Id.*, ¶ 3.2.1 ("[E]ach Party is responsible for the Operation of its Exclusive-Use Area at its sole cost and expense."). However, if an area is Common Area, the Judicial Defendants are "responsible for its operation, which refers to the "administration, management, maintenance, and repair." *Id.*, ¶ 3.2.1; JOA (Definitions) on p.4. The Common Area refers to the areas "that are used non-exclusively and in common by, or for the common benefit of, the [Judicial Defendants], County, Court, and any Occupants." *Id.*, ¶ 2. It

39

includes "hallways, stairways, elevators, escalators, and restrooms that are not located in either Party's Exclusive-Use Area." JOA (Ex. E) to Shaver Decl., ¶ 2. The Judicial Defendants must obtain "the written consent from [the County] prior to conducting any maintenance, repair, or replacement of any equipment, fixture, or other property located in the common area that exceeds the sum of $2,500." *Id.*, ¶ 3.2.1. The Judicial Defendants can also make "reasonable additions and alterations to the Common Area, the cost of which will be a Shared Cost, but must first obtain the written consent of the [County] to those additions or alterations." *Id.*, ¶ 3.2.2.

There is scant evidence establishing which areas in the courthouse comprise the County's Exclusive-Use Areas, the Judicial Defendants' Exclusive-Use Areas, and Common Area. It is undisputed that the 4th floor has been exclusively occupied by the court since 1956. Shaver Decl., ¶¶ 16-17. Additionally, the District Attorney's Office is on the "0" floor, and is an office exclusively occupied by the County. Correll-Rose Decl., ¶ 9. Beyond these meager facts, the record does not identify exclusive use and non-exclusive use areas on each courthouse floor.

The court finds that there are triable disputes as to whether Barrilleaux's two remaining claims involve areas for which the Judicial Defendants, and not the County, are solely responsible under the JOA. For example, regarding the claim for damages arising out Barrilleaux's difficulties using the 5th floor restroom, there are no record facts establishing whether the County is responsible for that claim because that restroom is in the County's exclusive use area, or whether the Judicial Defendants are responsible, because the 5th floor restroom is either in their exclusive use area, or is a Common Area.

As for the claim for injunctive relief to install a second set of accessible restrooms, the record shows that the 1996 renovations —construction of a courtroom — may have triggered the County's duty under the ADA to make the paths of travel accessible (which includes restrooms), and that those renovations occurred on the 1st floor because courtroom A is located there. However, there are no facts showing what other operations occur on the first floor. It is possible that the 1996 renovations involved judicial exclusive-use areas and/or Common Area. It is possible that the JOA would therefore place the obligation to provide accessible restrooms in that location on the Judicial Defendants, and not the County. However, given the sparse factual

record, and lack of legal analysis by the parties, the court cannot so find at this juncture.

The facts regarding the pre-2013 construction on the 4th Floor are similarly too scant to form the basis for a ruling at summary judgment. Some construction occurred, but the nature, scope and cost are completely unknown. Therefore, it is not possible to say at this juncture whether that construction triggered a duty regarding the provision of accessible bathrooms.

In response, Barrilleaux makes two arguments, neither of which directly addresses the County's contentions regarding the JOA and the Transfer Agreement. She first argues that the Judicial Defendants and the County are jointly responsible and therefore jointly liable for the Common Area, because the County retains title to the courthouse building. To support this argument, Barrilleaux points to California Government Code Section 70393, which states that the County "shall have the following authority and responsibilities with regard to court facilities in addition to any other authority or responsibilities established by law: (a) Manage the shared-use buildings whose title the county retains under subdivision (b) of Section 70323." Cal. Gov't Code § 70393. According to Barrilleaux, since the County still retains title over the courthouse building, it still has the authority and responsibility to "manage" the courthouse along with the Judicial Defendants. Along these same lines, Barrilleaux asserts that Section 3.2.2 of the JOA expressly establishes the County's joint liability and responsibility for the Common Area in the courthouse. Section 3.2.2 of the JOA provides, among other things, that (1) the Judicial Defendants must obtain the "written consent" of the County if the "maintenance, repair, or replacement of any equipment, fixture, or other property located in the common area" exceeds $2,500, and (2) the Judicial Defendants "may make reasonable additions and alterations to the Common Area, the cost of which will be a Shared Cost, but [they] must first obtain the written consent of the [County] to those additions or alterations." *See* JOA (Ex. E) to Shaver Decl., ¶ 3.2.2 (Common Area). Barrilleaux contends that by reserving the right to authorize or decline maintenance or alterations made to the Common Area, the County retained control over the Common Area, and is thus jointly liable for the Common Area.

These arguments are too generalized to be probative. Barrilleaux does no more than recite the legal obligations as set forth in the statute and the documents regarding the County's shared

41

1    responsibilities for the courthouse when it retained title to the building following transfer of duties

2    under the TCFA.  Contrary to what she suggests, the fact that the County maintained certain

3    responsibilities for the courthouse building under the JOA when it retained title does not imply,

4    much less establish, that it necessarily retained liability for the claims in her case.  As discussed

5    above, on this record, there are triable disputes as to whether the JOA and the Transfer Agreement

6    eliminate the County's liability for the two remaining claims in this case because there are

7    numerous open factual questions about whether her claims involve Common Area or Exclusive-

8    Use areas in the courthouse building.

9          Barrilleaux's second argument is that the court cannot interpret the JOA as transferring all

10   responsibility for the Common Area to the Judicial Defendants, because the County's duty under

11   the ADA to provide a second set of accessible restrooms is non-delegable.  According to

12   Barrilleaux, the non-delegable nature of the County's duties under the ADA would be undermined

13   if the County were permitted to "contract away" liability through a *de facto* contractual

14   indemnification.

15         The only cases Barrilleaux cites for this proposition are readily distinguishable.  They

16   address the ability of a party to bring a state law claim for contribution and/or indemnification

17   against a third party in response to an ADA lawsuit.  *See, e.g., Equal Rights Ctr. v. Niles Bolton*

18   *Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (explaining that "compliance with the ADA and FHA .

19   . . is 'nondelegable' in that an owner cannot insulate himself from liability for [] discrimination in

20   regard to living premises owned by him and managed for his benefit merely by relinquishing the

21   responsibility for preventing such discrimination to another party," and finding state law

22   indemnity claim preempted) (citation and internal quotation marks omitted); *United States v.*

23   *Dawn Props., Inc.*, 64 F. Supp. 3d 955, 962 (S.D. Miss. 2014) (explaining that it is the

24   responsibility of the third-party plaintiffs "to ensure compliance with the FHA and the ADA"

25   since this "duty [is] non-delegable," and finding state law contribution claim preempted);

26   *Feltenstein v. City Sch. Dist. of New Rochelle*, No. 14-CV-7494 (CS), 2015 WL 10097519, at *3

27   (S.D.N.Y. Dec. 18, 2015) (explaining that the "City is correct that no right to indemnification or

28   contribution exists under New York common law for actions brought under the ADA or

42

Rehabilitation Act") (citing *Access 4 All Inc. v. Trump Int'l Hotel & Tower Condo.*, No. 04-CV-7497KMK, 2007 WL 633951, at *6-8 (S.D.N.Y. Feb. 26, 2007)).

None of these cases stand for the sweeping proposition that Barrilleaux appears to make here, which is that once a party becomes obligated to make an alteration pursuant to an ADA regulation, that duty is per se "non-delegable," and can never be transferred to another party pursuant to contract under any circumstances. Her scant citations and meager analysis do not justify the far-reaching ruling she seeks.

In sum, the court finds that there are factual questions regarding (1) whether the 1991 or 1996 renovations or other pre-2013 construction work by the County triggered a duty under an ADA regulation to install a second set of restrooms in the courthouse, (2) if so, which party is responsible for such a duty pursuant to the JOA and Transfer Agreement; and (3) which party is responsible for the 5th floor restroom pursuant to the JOA and Transfer Agreement, which would appear to determine whether the County or the Judicial Defendants are responsible for Barrilleaux's damages arising from her alleged difficulties in using that restroom.[13] These factual questions preclude summary judgment on these issues.

The court now considers the remaining issues in the County's motion: standing, mootness, and substantive challenges to the ADA, Section 504, and state law claims. Since standing and mootness are jurisdictional, the court considers these issues first.

### 4. Standing

The County contends that Barrilleaux lacks Article III standing because she cannot demonstrate causation, redressability, or a realistic threat of future injury traceable to the County.

Although "its purpose is sweeping and its mandate comprehensive, the ADA's reach is not unlimited. Rather, as with other civil rights statutes, to invoke the jurisdiction of the federal courts, a disabled individual claiming discrimination must satisfy the case or controversy requirement of Article III by demonstrating his standing to sue at each stage of the litigation." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (citation and internal

---

[13] The parties failed to address the interaction of the damages claim with the JOA and Transfer Agreement.

quotation marks omitted).  However, "[t]he Supreme Court has instructed [courts] to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039–40 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

"'[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, (2000)). "When seeking prospective injunctive relief, the plaintiff must [also] show a likelihood of future injury." *Kirola*, 860 F.3d at 1174 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). The County concedes that Barrilleaux has satisfied the "injury-in-fact" requirement. *See* Def.'s Reply at 13:2-3 [Docket No. 200].  However, it contends that Barrilleaux has not met the other requirements of Article III standing.

### a.    Causation

The County argues that Barrilleaux cannot show that her knee injury was "fairly traceable to" or caused by the County, because the County was not responsible for maintaining the Common Area in the courthouse that Barrilleaux encountered in 2013, nor was it responsible for ensuring that members of the public such as Barrilleaux had access to superior court proceedings on the 4th floor.  The County also contends that Barrilleaux herself is responsible for her injury because she chose to walk down four flights of stairs from the 4th floor to the 1st floor instead of using the elevator, or a combination of the elevator and one set of stairs.

Barrilleaux disagrees.  According to Barrilleaux, the County remains responsible for providing an additional set of accessible restrooms as a result of the 1991, 1996, and other alterations addressed above at length.  Barrilleaux reiterates that the County's ADA obligations to make the courthouse accessible are non-delegable, and therefore could not be transferred to the

Judicial Defendants pursuant to the JOA and the Transfer Agreement.

The court finds that Barrilleaux can likely demonstrate causation in her claim for injunctive relief requiring the installation of a second set of accessible restrooms. To the extent that the County argues that the Transfer Agreement and JOA eliminate its responsibility for the Common Area, which includes the maintenance of restrooms, the court rejects this argument at summary judgment for the reasons stated above. Additionally, the County fails to explain how Barilleaux's decision to walk down four flights of stairs has any bearing on the causation prong, which focuses on the connection between the injury and the defendant's challenged conduct. *See Kirola*, 860 F.3d at 1174 (The causation prong of Article III standing requires that the "injury is fairly traceable to the challenged action of the defendant."). The County cites no case for its proposition that a court may consider a plaintiff's own potential comparative fault in assessing whether the plaintiff demonstrates an injury that is "fairly traceable" to the defendant's challenged conduct for the purposes of Article III standing.[14]

### b. Redressability

The County's arguments for redressability are identical to those regarding causation. The court therefore finds that Barrilleaux can likely demonstrate redressability for the same reasons discussed above.

### c. Realistic Threat of Future Harm

The County argues that Barrilleaux cannot demonstrate a realistic threat of future harm for two reasons. First, the County reiterates that it is not responsible for redressing any future harm she may encounter at the courthouse based on the JOA and the Transfer Agreement. As discussed earlier, there are triable disputes regarding whether, and to what degree, the County may be responsible for the remaining claims, so the court rejects this argument for the same reasons.

The County next attacks Barrilleaux's assertion of future harm. Barrilleaux states that she

---

[14] To the extent that the County contends that a plaintiff's comparative fault or negligence is a defense or a relevant consideration in an ADA claim, "[s]everal courts have held that contributory negligence is not an affirmative defense to a violation of the Americans with Disabilities Act." *Doe v. St. John's Hosp. of the Hosp. Sisters of the Third Order of St. Francis*, No. 16-3172, 2016 WL 5929330, at *3 (C.D. Ill. Oct. 11, 2016) (citing cases).

45

has friends in Mendocino County and intends to return there to visit, and that she "intend[s] to return to Department G as a member of the public to observe proceedings but cannot physically do so until two stair lifts are installed so that [she does not] have to climb or descend stairs." Decl. of Jessica Barrilleaux, ¶ 17 (Ex. 21) to Rein Decl. [Docket No. 195-21]. The County contends that this statement of future harm is speculative, conjectural, hypothetical, and contingent, and does not show that a future harm is likely. According to the County, Judge Henderson previously found the same statement, along with other statements in her declaration, were insufficient to demonstrate an "actual or imminent injury required to establish standing to seek injunctive relief." Since Barrilleaux did not seek reconsideration of Judge Henderson's ruling, it stands as the "law of the case" and requires that the court enter summary judgment in its favor on this issue. Barrilleaux disagrees. She argues that her statement is sufficient to show future harm, in light of her past difficulties with accessing the courthouse. Additionally, she contends that the "law of the case" doctrine does not apply here.

For the reasons discussed earlier, Barrilleaux is correct that the "law of the case" doctrine does not apply. Furthermore, the County misquotes Judge Henderson's order denying the motion for mandatory injunction. In the quoted section of that order, Judge Henderson simply describes the County argument: namely that the "County argued, without any rebuttal from Barrilleaux, that these speculative, vague, assertions of future harm are insufficient because '[s]uch some day intentions - without any description of concrete plans, or indeed even any specification of when the some day will be - do not support a finding of the 'actual or imminent' injury required to establish standing to sue for injunctive relief." August 15, 2016 Order Denying Pl.s' Mot. for Prelim. Injunction at 4:23-28 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)). Judge Henderson made no order to that effect.

As to whether Barrilleaux has presented a "realistic threat of future harm," the Ninth Circuit has explained that while "'past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy,' 'past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Fortyune v. Am. Multi-Cinema*, *Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) (quoting *City of Los Angeles v. Lyons*,

461 U.S. 95, 103 (1983) and *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Additionally, "an ADA plaintiff can show a likelihood of future injury when he intends to return to a noncompliant accommodation and is therefore likely to reencounter a discriminatory architectural barrier." *Chapman*, 631 F.3d at 950. "Alternatively, a plaintiff can demonstrate sufficient injury to pursue injunctive relief when discriminatory architectural barriers deter him from returning to a noncompliant accommodation." *Id.* According to the Ninth Circuit, "[j]ust as a disabled individual who intends to return to a noncompliant facility suffers an imminent injury from the facility's "existing or imminently threatened noncompliance with the ADA," a plaintiff who is deterred from patronizing a store suffers the ongoing "actual injury" of lack of access to the store." *Id.* (quoting *Pickern*, 293 F.3d at 1138). Thus, courts have "Article III jurisdiction to entertain requests for injunctive relief both to halt the deterrent effect of a noncompliant accommodation and to prevent imminent "discrimination," as defined by the ADA, against a disabled individual who plans to visit a noncompliant accommodation in the future." *Chapman*, 631 F.3d at 950; *see also Harris v. Stonecrest Care Auto Ctr., LLC*, 472 F. Supp. 2d 1208, 1216 (S.D. Cal. 2007) ("In determining whether a plaintiff's likelihood of returning to a particular establishment is sufficient to confer standing [under the ADA], courts have examined factors such as: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definiteness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the accommodation in question.").

Here, Barrilleaux proffers the same declaration that she submitted in support of her motion for preliminary injunction back in July 2016. Barrilleaux Decl., ¶ 17 (Ex. 21) to Rein Decl. It is not tethered to the remaining injunctive relief claim. The court will focus solely on whether Barrilleaux has demonstrated a "realistic threat of future harm" with respect to the installation of a second set of accessible restrooms. Construing all the evidence in Barrilleaux's favor, the court finds that the evidence, although sparse, supports a realistic threat of future harm. Barrilleaux asserts that she intends to return to the courthouse to observe court proceedings because she has friends in Mendocino County and regularly visits Mendocino County. Barrilleaux does not articulate the "future harm" she believes she will experience in visits to the courthouse due to the

lack of a second set of accessible restrooms. However, employing common sense, the court assumes that the future harm is the inconvenience of having to travel to the 5th floor to use the restroom, rather than using a more convenient accessible restroom on a courtroom floor.

The County cites *Bowman v. Best W. Station House Inn*, No. 2:04-CV-0755 GEB (PAN), 2005 WL 3453712, at *1-2 (E.D. Cal. Dec. 16, 2005), and *Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001), but both are factually inapposite. In *Bowman*, the court granted summary judgment for the defendant on the claim for injunctive relief under the ADA which requested the removal of certain architectural barriers at the defendant-inn, because it was "undisputed" that the plaintiff had "no intention of returning" to the defendant-inn and thus could not demonstrate a likelihood that she would reencounter any discrimination. *Id.* at *1-2. Similarly, in *Shotz*, also cited by *Bowman*, the Eleventh Circuit held that the plaintiffs could not state a claim for injunctive relief under the ADA because they did not allege a "real and immediate threat of future discrimination." 256 F.3d at 1082. According to the Eleventh Circuit, the complaint "contain[ed] only past incidents of discrimination" and, "[m]ore importantly," the plaintiffs had "not attempted to return [to the county courthouse], nor [had] they alleged that they intend[ed] to do so in the future." 256 F.3d at 1082.

By contrast, Barrilleaux alleges that she intends to return to the courthouse and Courtroom G, and presents facts supporting the likelihood of her return to the courthouse. In conclusion, the court finds that Barrilleaux has demonstrated sufficient Article III standing and denies summary judgment on this issue.

### 5. Mootness

The County asserts that even if Barrilleaux has standing to pursue the request for injunctive relief, it should be dismissed as moot. According to the County, Barrilleaux already obtained the relief sought via her settlement with the Judicial Defendants. The only remaining request for injunctive relief relates to the installation of a second set of accessible restrooms. Accordingly, the court will confine the mootness analysis to this request.

Under Article III of the Constitution, federal court jurisdiction only exists over cases and controversies. U.S. Const., art. III, § 2. "Because the power of a federal court to decide the merits

48

of a claim ordinarily evaporates whenever a prerequisite to standing disappears, the doctrine of mootness has been described as 'the doctrine of standing set in a time frame.'" *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017) (quoting *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1509 (9th Cir. 1994)). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Id.* at 862. "A plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant has no claim for an injunction." *Id.* at 864. "The party asserting mootness bears the heavy burden of establishing that there remains no effective relief a court can provide." *Id.* at 862 (citing *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)); *see also Johnson v. Cal. Welding Supply, Inc.*, No. CIV. 2:11-01669 WBS, 2011 WL 5118599, at *3 (E.D. Cal. Oct. 27, 2011) ("Once a defendant has remedied all ADA violations complained of by a plaintiff, the plaintiff's claims become moot and he or she loses standing, meaning the court no longer has subject matter jurisdiction over the ADA claims.") (citing *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1130–31 (C.D. Cal. 2005)).

Applying these principles, the court finds that the County has not met its heavy burden to establish that there is no effective relief that the court can provide. The installation of a second set of accessible restrooms was not part of the settlement with the Judicial Defendants, and any responsibility for such relief cannot be determined at summary judgment for the reasons discussed above.

In sum, the court denies summary judgment on the jurisdictional issues of standing and mootness and now considers the substantive challenges to the ADA claim for injunctive relief and for damages relating to the 5th floor restroom, the Section 504 claim, and the state law claims.

### 6. ADA

Title II of the ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a claim for disability discrimination under Title II of the ADA, a plaintiff must prove that "(1) [s]he is a qualified individual with a disability;

1  (2) [s]he was excluded from participation in or otherwise discriminated against with regard to a

2  public entity's services, programs, or activities, and (3) such exclusion or discrimination was by

3  reason of h[er] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (citing

4  *Weinreich v. Los Angeles Co. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).  The

5  parties do not dispute that Barrilleaux is "a qualified individual with a disability" for the purpose

6  of this motion, *see* Def.'s Mot. for Summ. J. at 13:28-14:2.  Therefore, only the second and third

7  elements are in dispute on Barrilleaux's ADA claim for injunctive relief.

8  a. **Denial of The County's Services, Programs, or Activities**

9    The County argues that there is no evidence that Barrilleaux was denied the benefits of any

10  county services, programs, or activities, because the only services, programs, or activities to which

11  she allegedly was denied access were the superior court proceedings on the 4th floor.  According

12  to the County, the Judicial Defendants are solely responsible for providing access to the superior

13  court proceedings pursuant to the TCFA.  Barrilleaux disagrees with the County's characterization

14  of the ADA claim.  According to Barrilleaux, she asserts that she was also denied the benefits of

15  an accessible restroom because she had difficulties getting to one.  Barrilleaux contends that the

16  provision of public restrooms is a county service, program or activity.

17    The court agrees with Barrilleaux.  The County construes Barrilleaux's ADA claim too

18  narrowly.  Barrilleaux's ADA claim for injunctive relief relates to the lack of a second set of

19  accessible restrooms in the courthouse.  It is undisputed that Barrilleaux entered a county-owned

20  building (the courthouse) and used a county-installed restroom on the 5th floor on her way to a

21  hearing on the 4th floor.  Additionally, as discussed above, it is unclear whether the County

22  relinquished all responsibility over all restrooms in the courthouse under the JOA and Transfer

23  Agreement.  Indeed, pursuant to the JOA, the County appears to retain responsibility over

24  restrooms located in its exclusive-use areas.

25    *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002), cited by Barrilleaux, is

26  instructive here.  The plaintiffs in *Barden* were individuals with mobility and/or vision disabilities

27  who sued the City of Sacramento, alleging that the City violated the ADA and the Rehabilitation

28  Act by failing to install curb ramps in the newly constructed sidewalks and maintain the existing

50

sidewalks in accordance with those laws. 292 F.3d at 1075. The district court granted summary judgment in favor of the City, holding that public sidewalks were not a "service, program, or activity," and therefore were not subject to the program access requirements of Title II of the ADA of the Rehabilitation Act. 292 F.3d at 1075. The Ninth Circuit reversed, holding that public sidewalks were "a service, program, or activity" of the City within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act. *Id*. at 1074.

The Ninth Circuit explained that the ADA's "broad language" should be construed "'[as] bring[ing] within its scope 'anything a public entity does.'" *Id.* at 1076 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)). "[T]he focus of the inquiry, therefore, is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Id.* (citation and internal quotation marks omitted). Accordingly, the Ninth Circuit observed that "maintaining public sidewalks is a normal function of a city and 'without a doubt something that the [City] does.'" *Id.* (quoting *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1173 (9th Cir. 2002)); *Hason*, 279 F.3d at 1173 ("Medical licensing is without a doubt something that the Medical Board "does." As such, we conclude that medical licensing clearly falls within the scope of Title II."). The Ninth Circuit concluded that maintaining the accessibility of public sidewalks "for individuals with disabilities therefore falls within the scope of Title II." *Id.*

Pursuant to *Barden*, to determine whether the maintenance and provision of public restrooms are a "service, program, or activity" falling within the scope of Title II, the court must determine whether "it is a normal function of a governmental entity." 292 F.3d at 1076 (citation and internal quotation marks omitted). Similar to the maintenance of public sidewalks in a city, the provision and maintenance of public restrooms in a county-created and owned building is a quintessential function of a governmental entity. Accordingly, maintaining the accessibility of public restrooms for individuals with disabilities would also fall within the scope of the services, programs, or activities covered by Title II of the ADA. *Id*.

The County's arguments in response are unpersuasive. Contrary to what the County argues, Barrilleaux does not contend that restrooms by themselves are a normal function of a

51

United States District Court
Northern District of California

governmental entity. Rather, it is the provision and maintenance of public restrooms in a public building that constitutes a normal function of a governmental entity. Additionally, despite the County's argument, as previously noted, there are triable disputes regarding the County's responsibility for providing and maintaining accessible restrooms in the courthouse due to the transfer of certain responsibilities for the courthouse to the Judicial Defendants in 2008.

In sum, the court finds that there is a triable dispute regarding whether the County denied Barrilleaux a county service, program, or activity that falls within the scope of Title II.

### b.    Discrimination Because of Disability

The County argues that it did not discriminate against Barrilleaux on the basis of disability because it was not responsible for providing accessible restrooms in the courthouse at the time of Barrilleaux's 2013 visits due to the 2008 transfer of responsibilities to the Judicial Defendants. Barrilleaux's arguments in response mirror those already discussed. For reasons previously stated, there is a triable dispute as to whether the County is responsible for providing a second set of accessible bathrooms. Accordingly, the court finds that there is a triable dispute as to whether the County discriminated against Barrilleaux on the basis of disability.

### c.    Deliberate Indifference

To recover monetary damages under Title II of the ADA, a plaintiff must show intentional discrimination. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998). In the Ninth Circuit, in order to establish intentional discrimination, a plaintiff must demonstrate "deliberate indifference," which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001).

According to the County, summary judgment should be granted on Barrilleaux's damages claim because she has not presented facts sufficient to support a finding of deliberate indifference. The court limits its analysis to the sole remaining claim for damages, which relates to Barrilleaux's difficulties in using the 5th floor restroom. The court ordered the parties to submit supplemental briefing on this issue because they did not address it in their papers, and specifically directed Barrilleaux to "explain and cite to record evidence that establishes the County's deliberate

indifference in failing to provide her with a fully accessible restroom in 2013 (the date of the incident)." [Docket No. 204 at 2:22-24].

Having reviewed the parties' supplemental briefing, the court finds that Barrilleaux has failed to raise triable disputes regarding the County's deliberate indifference in failing to provide her with a fully accessible restroom on the 5th floor. The record shows that the County agreed to make at least one set of women's restrooms in the courthouse accessible as result of the 1998 Settlement with the DOJ. Ex. 1 to Rein Decl. at BARR 00012. There is no evidence that the County knew that the 5th floor restroom was not fully accessible after it modified that restroom pursuant to the 1998 DOJ Settlement Agreement and before Barrilleaux used it in 2013. For example, there is no evidence in the record of any complaints to the County about the accessibility of the 5th floor restroom in the period between the 1998 restroom alterations and Barrilleaux's 2013 courthouse visit.

The remaining evidence that Barrilleaux identifies is not specific to the 5th floor restroom. She cites to documents showing that (1) the County knew in 1991 that it had obligations under federal and state law to make the renovated facility disability accessible as a result of the 1991 modifications, but chose not to fulfill those obligations due to budgetary reasons, and (2) the County had received at least one complaint relating to the accessibility of the courthouse in 1991. *See* Exs. 4 (December 1991 Minute Order) and 11 (December 1991 Memorandum) to Rein Decl. According to Barrilleaux, these documents, and others, show that the County knew for 22 years that there were no accessible restrooms in the entire building despite performing "major renovations" that triggered its accessibility obligations under the ADA implementing regulations. *See, e.g.*, Ex. 3 to Rein Decl. (County's response to RFA No. 61 admitting that construction work was performed on the 4th floor after January 1, 1969 but before April 23, 2013); Exs. 23-25 (documents relating to the 1991 renovations); Exs. 5, 6, 7, 10, 16 (documents relating to the 1996 renovations). This argument attempts to prove too much. At best, construing all inferences in Barrilleaux's favor, the evidence supports the argument that the County knew that there were no accessible restrooms in the building prior to 1998. Specifically, the evidence suggests that the County knew in 1991 that it had accessibility obligations under the ADA's implementing

regulations, but decided not to fulfill these obligations at that time due to budgetary reasons. The evidence further demonstrates that there was no accessible restroom in the building until the 1998 DOJ Settlement. However, for the period *after* the County made that restroom accessible pursuant to the 1998 DOJ Settlement, until 2013 when Barrilleaux used that restroom, the evidence does not demonstrate that the County knew that "harm to a federally protected right" was substantially likely, i.e., that the 5th floor restroom was not fully accessible. Nor does the evidence show that the County failed to act upon that knowledge.

In sum, the court finds that there are triable disputes regarding the second and third elements of Barrilleaux's ADA claim for injunctive relief (installation of a second set of restrooms), and therefore denies the County's motion. However, the court grants the County's motion with respect to Barrilleaux's ADA claim for damages arising out of the difficulties in using the 5th floor restroom.

### 7.      Section 504

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a). Thus, Section 504 is "materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance . . . ." *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) (citation and internal quotation marks omitted).

"The Rehabilitation Act defines 'program or activity' broadly to include "all of the operations of . . . [an] instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance.'" *Cal. Found. for Indep. Living Centers v. Cty. of Sacramento*, 142 F. Supp. 3d 1035, 1059 (E.D. Cal. 2015) (quoting 29 U.S.C. § 794(b)). The Ninth Circuit has explained that "Congress adopted this broad definition in response to *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 635–36 (1984), where the Court narrowly construed 'program or activity' to reach 'only the specific parts of a recipient's operation which directly benefited from federal assistance.'" *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir.

2009). Accordingly, it has interpreted the term "program or activity" broadly. *Sharer*, 581 F.3d at 1178 (citation and internal quotation marks omitted). But, the term 'program or activity' in Section 504 is not so broad as to encompass "all activities of the State;" "[i]nstead it only covers all the activities of the department or the agency receiving federal funds." *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002). A state may avoid a Section 504 waiver of sovereign immunity "'on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others.'" *Sharer*, 581 F.3d at 1178 (quoting *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc)).

According to the County, Barrilleaux cannot pursue a Section 504 claim because she cannot establish that the County receives federal funding for the courthouse itself or any of the programs provided within it. Barrilleaux disagrees, arguing that the County admitted that it receives federal and state funding for various programs such as community development block grants, and that it uses federal funding to, among other things, "remove architectural barriers."[15] 30(b)(6) Shaver Depo. at 67:3-11, 68:18-69:12.

Having reviewed the record, the court finds that Barrilleaux has failed to raise triable disputes as to whether the County receives federal funding for the courthouse or the programs contained therein, including the restrooms. At best, the evidence demonstrates that the County receives some unspecified federal funding, some of which is used to remove unspecified architectural barriers. This is insufficient to show that the County received federal funding for the programs or activities at issue in this case. Therefore, the court grants the County's motion on the Section 504 claim.

### 8. State Law Claims

Barrilleaux alleges four state law claims: 1) violation of the CDPA; 2) violation of

---

[15] Barrilleaux's argument regarding the County's liability under Section 504 for its receipt and use of federal funds to remove architectural barriers is completely opaque. To the extent that she argues that the County's use of federal funds to remove unspecified architectural barriers from unspecified buildings is somehow sufficient to confer Section 504 liability for its failure to create accessible paths of travel (accessible restrooms), her argument is unsupported. She does not identify what the architectural barriers were or what building(s) the barriers were removed from. Nor does she cite to any on-point authority to support this contention.

California Government Code § 11135 (discrimination under program receiving financial assistance from the state); 3) violation of California Government Code § 835 (dangerous condition of public property); and 4) common law negligence.

The County moves for summary judgment on these claims because Barrilleaux did not provide adequate notice of the bases for these claims in her Government Claim. The County also argues that the claims otherwise fail on the merits. Barrilleaux contends that her Government Claim adequately discloses the bases for all of the state law claims, and triable disputes exist on each claim, precluding summary judgment.

"The California Tort Claims Act requires anyone suing a public entity to first file a claim with the entity that includes a 'general description' of the alleged injury 'so far as it may be known at the time of presentation of the claim.'" *K.T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970, 981 (N.D. Cal. 2016) (quoting Cal. Gov't Code §§ 910, 945.4); *see also Robinson v. Alameda Cty.*, 875 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012). "The purpose of [the California Torts Claims Act] is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" *Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 446 (2004) (quoting *City of San Jose v. Superior Court* (1974) 12 Cal. 3d 447, 455 (1974)). "Consequently, a claim need not contain the detail and specificity required of a pleading, but need only fairly describe what [the] entity is alleged to have done." *Stockett*, 34 Cal. 4th at 446 (citation and internal quotation marks omitted)); *see also Blair v. Sup. Court*, 218 Cal. App. 3d 221, 224 (1990) ("As long as these general elements are present, it is not necessary that the claim comply with formal pleading standards.").

Pursuant to Section 910 of the Government Code, a claim must contain, among other information, (1) "the date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" (2) "[a] general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim" and (3) "[t]he name or names of the public employee or employees causing the injury, damage, or loss, if known." Cal. Gov't Code § 910. Since "the purpose of the claim is to give the government entity

56

notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions,"

"the claims statute "should not be applied to snare the unwary where its purpose has been

satisfied." *Stockett*, 34 Cal. 4th at 446 (citation and internal quotation marks omitted)).

Accordingly, the claim "need not specify each particular act or omission later proven to have

caused the injury." *Stockett*, 34 Cal. 4th at 447.

"Where the complaint merely elaborates or adds further detail to a claim, but is predicated

on the same fundamental actions or failures to act by the defendants, courts have generally found

the claim fairly reflects the facts pled in the complaint." *Id.*; *see, e.g, id.* at 443 (holding that the

plaintiff was not "barred from asserting additional wrongful dismissal theories in his complaint

where . . . the notice of claim informs the public entity of the employment termination cause of

action giving rise to the claim and provides sufficient detail for investigation by the public

entity"). But where there is a "'complete shift in allegations, usually involving an effort to

premise civil liability on acts or omissions committed at different times or by different persons,'"

courts have generally found the complaint barred. *Stockett*, 34 Cal. 4th at 447 (quoting *Blair*, 218

Cal. App. 3d at 226); *see, e.g., Cook v. Cty. of Contra Costa*, No. 15-CV-05099-TEH, 2016 WL

913395, at *4 (N.D. Cal. Mar. 10, 2016) (finding medical negligence lawsuit arising out of slip

and fall injury barred where the claim only discussed the slip and fall incident itself); *Nelson v.

Cty. of Los Angeles*, 113 Cal. App. 4th 783, 797 (2003) (finding survivorship claims barred where

the Estate did not file a claim, there was nothing in the decedent mother's claim "to suggest it was

filed in anything other than her individual capacity," and the damages described in the claim were

"for the loss of a son (with no mention of any damage incurred by [the decedent] before his

death)").

The court confines its analysis to the sole remaining claim regarding installation of a

second set of accessible restrooms. The County argues that the Government Claim fails to

disclose the factual basis for the remaining claim and thus precludes Barrilleaux from bringing it.

Barrilleaux contends that the Government Claim discloses an adequate factual basis because it

generally refers to the lack of accessibility of the courthouse.

Having reviewed Barrilleaux's Government Claim, attached as Exhibit A to the Correll-

Rose Declaration, the court finds that it did not adequately disclose any claims relating to the need for an additional set of accessible restrooms in the courthouse. The entire four-page narrative attached to the Notice of Claim describes her inability to access the superior court proceedings. *See* Attachment to Government Claim at 1-4 (Ex. A) to Correll-Rose Decl. [Docket No. 168-1]. It does not state anywhere that she used the restroom in the courthouse. In the absence of such facts in her Government Claim, the County did not and could not have had any notice of any claims based on those events. *See Stockett*, 34 Cal. 4th at 447; *Cook*, 2016 WL 913395, at *4. Even liberally construing the claim's reference to the "lack of accessibility for physically disabled persons at the Mendocino County Courthouse" to encompass the courthouse's restrooms, the narrative does not indicate in any way that this is a factual basis for her claims. *See, e.g.*, *Kim v. City of Belmont*, No. 17-CV-02563-JST, 2018 WL 500269, at *9 (N.D. Cal. Jan. 22, 2018) (finding First Amendment retaliation claim arising out of the officer's threat to arrest plaintiff for filing the incident barred where the claim did not make clear that the plaintiff "was threatened while inside the house after being told to stop filming").

Therefore, the court finds that Barrilleaux's remaining state law claims are barred and grants the County's motion as to these claims.

### B. Barrilleaux's Cross-Motion for Summary Judgment

Barrilleaux cross-moves on the following three issues: 1) the County discriminated against her in violation of federal law (ADA and Rehabilitation Act) by failing to provide equal programmatic and physical access to the courthouse; 2) the County discriminated against her in violation of California law by failing to provide accessible restrooms and a path of travel when it renovated the courthouse in 1996; and 3) the County is liable for its continuing deliberate indifference toward her as evident by the actions of its security guard who sent her to an inaccessible restroom and failed to offer her an accommodation. Pl.'s Opp'n and Cross-Mot. for Summ. J. at 27-37.

The court denies Barrilleaux's cross-motion on the Rehabilitation Act claim, the state law claims, and the ADA claim for damages based on the interactions with the security guard as moot. The court has already granted the County's motion for summary judgment on the Rehabilitation

Act and state law claims. As discussed previously, it has declined to consider any claim arising out of Barrilleaux's interactions with the security guard because she failed to disclose such a claim in the operative complaint or through her discovery responses.

Regarding Barrilleaux's sole remaining ADA claim requesting a second set of accessible restrooms, the court denies Barrilleaux's cross-motion because triable disputes exist regarding this claim.

## VI.     CONCLUSION

In conclusion, the court denies in part and grants in part the County's motion for summary judgment and denies Barrilleaux's cross-motion for summary judgment. The Further Case Management Conference is set for September 5, 2018. The parties' Joint Case Management Conference Statement is due no later than August 29, 2018.

**IT IS SO ORDERED.**

Dated: July 26, 2018



United States Magistrate Judge
Judge Donna M. Ryu